**UNITED STATES of America,**
**Plaintiff-Appellee,**

v.

**Sandra VACCARO, John Vaccaro, Michael Brennan, Paul Bond, Norman Alvis, Stephen Labarbera, Dorothy Snider, and William Cushing, Defendants-Appellants.**

Nos. 85–1153, 85–1154, 85–1161, 85–1170, 85–1179, 85–1180, 85–1195 and 85–1198.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Jan. 16, 1987.

Decided April 29, 1987.

See also, D.C., 602 F.Supp. 1132.

Donald C. Hill, Reno, Nev., for plaintiff-appellee.

Dominic P. Gentile and David Z. Chesnoff, Las Vegas, Nev., John L. Conner, N. Patrick Flanagan, III, James F. Jacques, William M. O'Mara, Mark Mausert and Fred Hill Atcheson, Reno, Nev., David Weiner and Thomas R. Van Noord, Cameron Park, Cal., for defendants-appellants.

Before HUG, and ALARCON, Circuit Judges, and STEPHENS, Jr.,[*] District Judge.

HUG, Circuit Judge:

This case involves charges of interstate travel to conduct unlawful activity in the State of Nevada in violation of 18 U.S.C. § 1952(a)(3) (1982) and interstate transportation of money obtained by fraud in violation of 18 U.S.C. § 2314 (1982). Some of the defendants were charged with aiding and abetting these offenses in violation of 18 U.S.C. § 2. This case also involves charges of conspiracy to violate 18 U.S.C. § 2314 and conspiracy to defraud the United States in violation of 18 U.S.C. § 371 (1982).

The indictment charged that 11 named defendants participated in an unlawful business enterprise in Nevada to cheat Nevada hotels and casinos by rigging slot machines to pay jackpots. The indictment charged that this involved interstate travel and interstate transportation of the money fraudulently obtained. The conspiracy charged was that some of the defendants conspired to make false reports to the Internal Revenue Service concerning the money so obtained.

Three of the defendants pled guilty and the remaining eight defendants were tried in a joint trial. Six of the eight defendants were charged with the conspiracy. All of the defendants were charged with several counts relating to particular incidents involving unlawful interstate travel or transportation and the rigging of jackpots at Nevada hotels or casinos. All defendants were convicted on all counts submitted to the jury.

The defendants raise numerous issues.

## I.

### FACTS

The evidence presented by the prosecution showed the following activity. The defendants were part of a scheme to cheat slot machines in which they rigged a large number of progressive slot machines by physically manipulating the slot machine reels to align winning combinations. They played various roles in this scheme to collect the rigged jackpots and avoid detection. For example, John Vaccaro and William Cushing scouted casinos to find favorable targets and to check the security systems. Ross Durham, a government witness who pled guilty prior to trial, would examine the machine to determine whether it could successfully be rigged. Once they determined that the jackpot could be "taken," Vaccaro would decide how many people would be required to rig the machine and collect the progressive jackpot.

A jackpot would be rigged by using a "collector," a "mechanic," "blockers," and "lookouts." A collector was usually recruited from outside the group and was given money to play the slot machine until the conditions in the casino were favorable for rigging the machine. While the collector was playing the slot machine, the lookouts would mingle about the casino and watch for casino personnel and were generally responsible for giving the "all clear" signal. The blockers played at machines nearby the targeted machine and gathered around the collector when the "all clear" signal was given.

[*] The Honorable Albert Lee Stephens, Jr., Senior United States District Judge for the Central District of California, sitting by designation.

When all appeared clear, the mechanic would go to the machine, open its door with a key or jam a wire through the side, and manipulate the reels to line up a jackpot. The jackpot would register and the entire group except the collector would leave the immediate area. The collector would then act excited, as if he or she had legitimately won, collect the money from the casino, and fill out the W–2–G tax form required by the Internal Revenue Service for jackpots over $1,200. Finally, the money would be divided. The collector received a slightly larger share to cover income tax liability and was advised about how illegally to avoid paying income taxes.

The interstate travel counts of the indictment involved thirteen separate slot machine cheating incidents in which interstate facilities were used to transport collectors from California to Nevada and to transport the proceeds of the incidents from Nevada to California. The conspiracy count alleged those thirteen incidents and four other cheating incidents as overt acts.

## II.

## JOINDER AND SEVERANCE

### A. *Joinder of Defendants*

The contention is made in this appeal that charges against the multiple defendants were improperly joined in the same indictment. Joinder is an issue of law reviewed *de novo*. *United States v. Friedman*, 445 F.2d 1076, 1082 (9th Cir.), *cert. denied*, 404 U.S. 958, 92 S.Ct. 326, 30 L.Ed.2d 275 (1971). Joinder of two or more defendants in the same indictment is governed by Fed.R.Crim.P. 8(b), which provides:

Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.

In this case, it is clear that the defendants were alleged to have participated in the same "series of acts or transactions." Whether the separate acts charged constitute a "series of acts or transactions" depends upon their being sufficiently related to each other. *United States v. Guerrero*, 756 F.2d 1342, 1345 (9th Cir.), *cert. denied*, 469 U.S. 934, 105 S.Ct. 334, 83 L.Ed.2d 270 (1984); *United States v. Ford*, 632 F.2d 1354, 1371 (9th Cir.1980), *cert. denied*, 450 U.S. 934, 101 S.Ct. 1399, 67 L.Ed.2d 369 (1981). Here, the transactions were all part of a continuing scheme to travel to Nevada to rig jackpots, to take the money back to California, and to work out a method by which the "collector" would not have to pay the full income tax due on the money received.

### B. *Severance*

Even though charges involving two or more defendants may have been properly joined, a defendant may move for severance under Fed.R.Crim.P. 14. Rule 14 provides:

If it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires....

The rule requires that a defendant must show prejudice to obtain a severance. Since some prejudice is inherent in any joinder of defendants, if only "some" prejudice is all that need be shown, few, if any, multiple defendant trials could be held. *See Ford*, 632 F.2d at 1373; *United States v. McDonald*, 576 F.2d 1350, 1355 (9th Cir.), *cert. denied*, 439 U.S. 830 and 927, 99 S.Ct. 105 and 312, 58 L.Ed.2d 124 and 320 (1978). Judicial economy justifies reliance on the jury to follow the instructions of the court that segregate the evidence and limit the applicability of the evidence to each defendant. The primary concern is whether the jury will be able to segregate the evidence applicable to each defendant and follow the limiting instructions of the court

as they apply to each defendant. The district court has wide discretion in ruling on a severance motion. *Opper v. United States*, 348 U.S. 84, 95, 75 S.Ct. 158, 165, 99 L.Ed. 101 (1954).

■ To obtain a reversal, a party must show that "joinder was so prejudicial that it outweighed the dominant concern of judicial economy." *United States v. Douglass*, 780 F.2d 1472, 1478 (9th Cir.1986) (quoting *United States v. Armstrong*, 621 F.2d 951, 954 (9th Cir.1980)). The prejudice of a joint trial must be such as to violate a defendant's fair trial rights: *i.e.*, unavailability of full cross-examination, lack of opportunity to present an individual defense, denial of the right of confrontation, lack of separate counsel among defendants with conflicting interests, or failure to instruct the jury properly on the admissibility of evidence as to each defendant. *Id.; United States v. Escalante*, 637 F.2d 1197, 1201 (9th Cir.), *cert. denied*, 449 U.S. 856, 101 S.Ct. 154, 66 L.Ed.2d 71 (1980).

■ All of the defendants except Sandra Vaccaro and Paul Bond were charged and convicted of conspiracy to defraud the United States. All of the substantive charges in the other counts were overt acts forming a part of the conspiracy count. Thus, the evidence applicable to those counts was relevant to the conspiracy count. "When many conspire, they invite mass trial by their conduct." *Kotteakos v. United States*, 328 U.S. 750, 773, 66 S.Ct. 1239, 1252, 90 L.Ed. 1557 (1946).

Both Sandra Vaccaro and Paul Bond, who were not charged with conspiracy, contend that they were unduly prejudiced because there was a mass of evidence presented that pertained only to their codefendants. They rely on *United States v. Donaway*, 447 F.2d 940 (9th Cir.1971).

In *Donaway*, nine defendants were charged in a ten-count indictment that involved two distinct schemes—one to affect illegally track odds on horse races and the other to drug horses. Donaway was accused of being involved only in the first scheme. The district court refused to grant a severance. The substantial majority of the Government's case was entirely

irrelevant to Donaway. The court held that, despite the giving of jury instructions respecting the limited admissibility of evidence against the various defendants, Donaway was severely prejudiced by the evidence relevant only to his codefendants, and thus his conviction was overturned. *Id.* at 943.

Sandra Vaccaro argues that only three of the Government's 52 witnesses implicated her, and less than 50 of the more than 5000 pages of trial transcript directly incriminated her. She contends that evidence not pertinent to her confused the jury and unfairly prejudiced her case. She understates, however, the amount of evidence and trial transcript that was relevant to her. Although only a small percentage of the proffered evidence directly implicated her, a much greater percentage of evidence was relevant to the charges against her because it showed the nature of the scheme in which she was allegedly involved and how the scheme was executed. Thus, unlike the situation in *Donaway*, where the overwhelming share of the evidence involved a scheme in which Donaway was not even involved, *Donaway*, 447 F.2d at 943, a great portion of the evidence offered here was directly relevant to Sandra Vaccaro's case. Sandra Vaccaro's role in the scheme was well-defined by the Government and the evidence pertaining to her could be easily considered apart from the other evidence. *See United States v. Patterson*, 455 F.2d 264, 266–67 (9th Cir.1972) (careful labeling of evidence helps to prevent jury confusion and weighs heavily against the need for severance).

Bond also contends that the confusing nature of the case and the mass of evidence that was irrelevant to the charges against him mandated severance. He was charged in six separate counts. As in the case of Sandra Vaccaro, evidence relating to other incidents in which he was not involved was relevant to his case because it showed the nature of the scheme and how it was carried out. The evidence presented that related to Bond was sufficiently clear so as to permit the jury to segregate the

evidence applicable to Bond and to follow the limiting instructions of the court.

Sandra and John Vaccaro contend that the district court's failure to sever prejudiced them because the marital communication privilege and the privilege against adverse spousal testimony foreclosed them from freely testifying. There is some doubt that the severance motions addressed the effect of these marital privileges or the ability of married codefendants effectively to defend themselves. However, even assuming that the motions properly raised this point, we conclude that the denial of severance was not error.

█ Two separate marital privileges exist. The first is the marital communication privilege, which allows a defendant to prevent his or her spouse from testifying about statements privately communicated by one spouse to another. *In re Grand Jury Investigation of Hugle,* 754 F.2d 863, 864 (9th Cir.1985). The second is a privilege against adverse spousal testimony, which can be asserted only by the witness-spouse. *Trammel v. United States,* 445 U.S. 40, 53, 100 S.Ct. 906, 913, 63 L.Ed.2d 186 (1980). This is a broader privilege which allows the exclusion of "evidence of criminal acts and of communications made in the presence of third persons." *Id.* at 51, 100 S.Ct. at 913.

█ The Vaccaros are therefore making two related arguments. First, either of the Vaccaros could have invoked the marital communication privilege to prevent his or her spouse from testifying as to privately communicated statements. However, there is no indication from the record or briefs that confidential marital communications would have provided favorable evidence. Second, either of the Vaccaros, when testifying, could have invoked the privilege against adverse spousal testimony and refused to give information damaging to the other. Conceivably, this could have resulted in either defendant not presenting testimony favorable to himself or herself. Once again, however, no specific showing has been made that favorable evidence was excluded for this reason.

Both of the Vaccaros' arguments are analogous to a case where the request for a severance is based on the asserted need for a codefendant's testimony, and the codefendant invokes his or her Fifth Amendment right not to testify. In those circumstances

> the moving defendant must show that he or she would call the codefendant at a severed trial, that the codefendant would in fact testify, and that the testimony would be favorable to the moving defendant. In addition, the district court must consider the possible weight and credibility of the testimony and the economy of severance at the point the motion was made.

*United States v. Little,* 753 F.2d 1420, 1446 (9th Cir.1984). *See also United States v. Davis,* 418 F.2d 59, 62 (9th Cir.1969). Thus, a showing that the testimony would be favorable, if available, would be necessary to establish any prejudice at all. Since the Vaccaros have failed to show undue prejudice, their claim of error based on the failure to sever because of marital privileges fails.

█ Alvis contends that the district court's failure to grant him a severance prejudicially affected his substantive rights to a fair trial by precluding him from fully cross-examining a witness about an alleged $16,000 payment she received from the Government as part of the Government's witness protection program. Alvis fails to note, however, that Cushing's defense counsel, on behalf of all defendants, moved during trial for an *in limine* order to prohibit the Government from inquiring into any witness's placement in the witness protection program and, in turn, agreed not to inquire into money the Government paid to the witnesses. Alvis did not object and the motion was granted. Thus, Alvis may not raise this issue on appeal. Fed.R.Crim.P. 12(f).

The district court's denial of all of the motions to sever was not an abuse of discretion.

## III.

### JUROR NOTE–TAKING

The defendants contend that the district court erred in prohibiting the jurors from

taking notes during trial. They argue that this would have allowed the jury more easily to have remembered and evaluated the evidence.

■ Whether it is advisable to permit a jury to take notes is a subject of some debate, and reasonable arguments are advanced for and against the practice. The decision of whether to allow the jury to take notes is left entirely to the discretion of the trial court. *Toles v. United States*, 308 F.2d 590, 594 (9th Cir.1962), *cert. denied*, 375 U.S. 836, 84 S.Ct. 79, 11 L.Ed.2d 66 (1983). *Accord United States v. Johnson*, 584 F.2d 148, 157–58 (6th Cir.1978), *cert. denied*, 440 U.S. 918, 99 S.Ct. 1240, 59 L.Ed.2d 469 (1979); *United States v. Bertolotti*, 529 F.2d 149, 159–60 (2d Cir.1975).

## IV.

### PROSECUTOR'S ARGUMENT

■ Defendants contend that the prosecution made numerous comments in closing argument that were prejudicial error. Both prosecuting attorneys and defense attorneys are allowed reasonably wide latitude in closing arguments and may strike hard blows based on the evidence and reasonable inferences from the evidence. Even statements that exceed these bounds do not constitute reversible error unless they were so gross as to have probably prejudiced the defendants and the prejudice was not neutralized by the trial judge. *United States v. Lester*, 749 F.2d 1288, 1301 (9th Cir.1984); *United States v. Birges*, 723 F.2d 666, 671–72 (9th Cir.), *cert. denied*, 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 and 469 U.S. 863, 105 S.Ct. 200, 83 L.Ed.2d 131 (1984).

In this case, attorneys for both sides were vehement. We have carefully examined the statements made by the prosecution that the defendants claim were prejudicial. Few, if any, of the statements were not justified by the evidence or reasonable inferences drawn from the evidence. Those that were questionable and objected to at trial were subject to corrective instructions by the judge. None of the statements was reversible error or of sufficient significance to justify detailed discussion in this opinion.

## V.

### ALLEGED USE OF PERJURED TESTIMONY

■ Defendants contend that the prosecution knowingly presented perjured testimony of Ross Durham. He was the "mechanic" that rigged most of the slot machines. He pled guilty and was a key witness at trial. The defendants' contention arises from the circumstances relating to Durham's plea agreement and sentencing. The agreement was that the maximum sentence to be imposed by the court was six years, with no fine or restitution. At the hearing following his plea agreement, at which the court was considering whether to accept the agreement, a representation was made by the prosecutor that Durham was not financially able to make restitution. The prosecutor stated: "Because of the contemplated sentence and because of his financial position which I do not believe, unfortunately, makes it possible reasonably to impose a restitution sentence." Durham made no statement or representation.

It later developed that, three days before his plea, Durham had received a check cosigned by an FBI agent for the sale of his house in the amount of $87,000. It appears that the prosecutor may have made a mistake in his representations to the district judge that may, or may not, have affected the judge's decision to accept the plea agreement. There was certainly no perjury by Durham.

The real relevance of the incident was the existence of possible bias in Durham's testimony at trial because he may have received undue leniency in his sentence. This was fully explored on direct and cross-examination, and the jury was made well aware of the plea agreement, the sentence, and the $87,000. The central concern is whether the jury was given a fair opportunity to assess Durham's credibility. Since it was, we find no possible prejudice to the defendants.

## VI.

### BRADY ISSUE

■ Sandra Vaccaro contends that the prosecution did not provide her attorney with exculpatory information, in violation of *Brady v. Maryland*, 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Specifically, she argues that the prosecutor failed to provide Durham's grand jury testimony that she did not aid and abet in the jackpot operation at the MGM Grand Hotel as charged in Counts XIV and XV of the indictment. Although Sandra Vaccaro was indicted on Counts XIV and XV, these counts were later dismissed as to her. Thus, the Government's failure to provide information of Durham's grand jury testimony could not have affected the outcome of her case. *See Brady*, 373 U.S. at 87, 83 S.Ct. at 1196; *United States v. Polizzi*, 801 F.2d 1543, 1553 (9th Cir.1986).

## VII.

### JENCKS ACT ISSUE

The defendants contend that the Government failed to comply with the requirements of the Jencks Act by not providing them with a recording of John Paul Jones's interview with a government agent.

■ The Jencks Act gives defendants the right to inspect all statements of a government witness that relate to the subject matter of the witness's testimony. *United States v. Dupuy*, 760 F.2d 1492, 1496 (9th Cir.1985). The Government, however, is only required to produce statements that are in its possession. 18 U.S.C. § 3500(b) (1982). Although Jones testified that Mr. Edwards of the Internal Revenue Service interviewed him and recorded the interview, Gaming Control Agent Tatro's testimony and the Government's investigation revealed that there was no tape recording. Thus, we find no Jencks Act violation.

## VIII.

### EVIDENCE OF OTHER CRIMES

Defendants contend that the district court abused its discretion in failing to exclude evidence of uncharged slot machine cheating incidents. We review a district court's decision to permit the Government to introduce evidence of a defendant's other crimes pursuant to Fed.R.Evid. 404(b) for an abuse of discretion. *United States v. Hodges*, 770 F.2d 1475, 1478–79 (9th Cir. 1985). A court's balancing of the probative value of evidence against its prejudicial harm under Fed.R.Evid. 403 is also reviewed for an abuse of discretion. *United States v. Jenkins*, 785 F.2d 1387, 1396 (9th Cir.), *cert. denied*, —— U.S. —— and ——, 107 S.Ct. 192 and 288, 93 L.Ed.2d 125 and 262 (1986); *United States v. Rubio*, 727 F.2d 786, 798 (9th Cir.1983).

■ Defendants attack three categories of evidence admitted at trial pursuant to Rule 404(b): evidence of specific uncharged jackpot cheating incidents;[1] evidence seized from Cushing's home, including three slot machines, hundreds of keys, catalogues, machinery, and tools allegedly used in the cheating scheme; and testimony of Ross Durham that he had participated in approximately 1500 jackpot cheating incidents over a five-year period.

As to the evidence of specific uncharged jackpot cheating incidents, admissibility need not hinge on Rule 404(b) because it was admissible as direct evidence of the conspiracy charged in Count XIX. *See United States v. Uriarte*, 575 F.2d 215, 216–17 (9th Cir.), *cert. denied*, 439 U.S. 963, 99 S.Ct. 449, 58 L.Ed.2d 421 (1978); *United States v. Testa*, 548 F.2d 847, 851 (9th Cir.1977). In any event, the evidence was clearly admissible under Rule 404(b) as proof of a plan or scheme or to show *modus operandi*. As we stated in *United States v. Bailleaux*, 685 F.2d 1105 (9th Cir.1982):

> Before evidence of [other] criminal conduct may be admitted [under Rule 404(b)], the following prerequisites must be met: (1) proof that the defendant committed the other crime must be clear and convincing; (2) the prior criminal conduct

---

**1.** This evidence includes the testimony of collectors and recruiters regarding uncharged jackpot cheating incidents and a videotape of an uncharged incident in New Jersey.

must not be too remote in time from the commission of the crime charged; (3) the prior criminal conduct must, in some cases, be similar to the offense charged; and (4) the prior criminal conduct must be introduced to prove an element of the charged offense that is a material issue in the case. Once these prerequisites have been satisfied, the evidence is admissible for those purposes permitted by Rule 404(b) if the Court determines that the probative value of the evidence is not substantially outweighed by the danger of unfair prejudice. Fed.R.Evid. 403. This balancing is committed to the sound discretion of the district court.

*Id.* at 1109–10 (citations and footnote omitted). The evidence is this case meets the *Bailleaux* test. The judge did not abuse his discretion under Fed.R.Evid. 403 by admitting the evidence. The evidence covered only 10 alleged jackpot cheating incidents in a 31–month conspiracy. In light of the 17 cheating incidents charged, the evidence was not excessively cumulative or prejudicial in light of its relevance. Therefore, the evidence was properly admitted.

Sandra and John Vaccaro contend that the physical evidence seized from Cushing's home was improperly admitted under Rule 404(b). They contend that the evidence was far more prejudicial to them than probative of Cushing's involvement. However, applying the same prerequisites set out above from *Bailleaux* would justify the admission of the evidence. Furthermore, the district judge admitted this evidence only as to Cushing and gave a limiting instruction to that effect.

Defendants also contend that admitting Durham's testimony that he was involved in approximately 1500 slot machine cheating incidents was prejudicial. This evidence, however, was elicited by defense counsel on cross-examination for the purpose of impeachment, not by the prosecution pursuant to Rule 404(b). Moreover, since no objection was made by any defendant to the admission of this testimony, we review it for plain error. Fed.R.Evid. 103; *Professional Seminar Consultants v. Sino American Technology*, 727 F.2d 1470, 1472 (9th Cir.1984). We find no such error here, especially since the testimony was elicited by the defense, not the prosecution.

## IX.

### AIDING AND ABETTING INTERSTATE TRAVEL

The defendants challenge the district court's ruling that a conviction for an aiding and abetting violation of the Travel Act under 18 U.S.C. §§ 1952 or 2314 does not require proof that the defendant knew or intended that interstate facilities were to be used. Neither knowledge of interstate travel nor knowledge of use of an interstate facility is an essential element of a violation of 18 U.S.C. §§ 1952 or 2314. *United States v. Powers*, 437 F.2d 1160, 1161 (9th Cir.1971); *United States v. Roselli*, 432 F.2d 879, 890–91 (9th Cir.1970), *cert. denied*, 401 U.S. 924, 91 S.Ct. 883, 27 L.Ed.2d 828 (1971). *Cf. United States v. Garner*, 663 F.2d 834, 839 (9th Cir.1981) (Government not required to establish an interstate connection to each defendant's activity, only that the scheme as a whole had substantial interstate connections), *cert. denied*, 456 U.S. 905, 102 S.Ct. 1750, 72 L.Ed.2d 161 (1982).

The defendants cite *United States v. McDaniel*, 545 F.2d 642 (9th Cir.1976), as supporting their argument that knowledge is an essential element. *McDaniel* held that the aider and abettor "must know that the activity condemned by the law is actually occurring and must intend to help the perpetrator." *Id.* at 644 (citing R. Perkins, Criminal Law 645 (1969)). The focus of sections 1952 and 2314 is the intent to facilitate the promotion or carrying on of an unlawful activity. *Roselli*, 432 F.2d at 891. Therefore, it must be proved, not that the defendants knew interstate facilities were being utilized, but only that they knew they were facilitating an unlawful activity, gambling violations. Thus, *McDaniel* does not support the defendants' argument.

Because an aider and abettor is punished as a principal, "the proof must encompass

the same elements as would be required to convict any other principal." *Hernandez v. United States*, 300 F.2d 114, 123 (9th Cir.1962). *See also United States v. Mehrmanesh*, 682 F.2d 1303, 1308 (9th Cir. 1982) (Government must prove aider and abettor had requisite mental state required for a violation of 21 U.S.C. § 841(a)(1)). Therefore, since it need not be proved that a principal had knowledge or an intention that interstate facilities were to be utilized, the Government, likewise, need not prove such knowledge by a defendant charged as an aider and abettor. Thus, the district court properly refused to instruct the jury that knowing use of interstate facilities is an essential element of an aiding and abetting violation of the Travel Act. The district court also properly refused to grant the defendants' motion for acquittal based on the Government's failure to prove this knowledge element.

 Bond further argues that his participation as a "blocker" in three jackpot cheating incidents does not fall within the purview of section 1952 because it did not constitute "a continuing course of criminal conduct." The Travel Act statute is violated when interstate traveling is employed to further an unlawful "business enterprise." *United States v. Kaiser*, 660 F.2d 724, 731 (9th Cir.1981), *cert. denied*, 455 U.S. 956, 102 S.Ct. 1467, 71 L.Ed.2d 674 and 457 U.S. 1121, 102 S.Ct. 2935, 73 L.Ed.2d 1334 (1982).

 "Business enterprise" has been defined as "a continuous course of criminal conduct rather than sporadic or casual involvement in a proscribed activity." *Id.* (citing *United States v. Donaway*, 447 F.2d 940, 944 (9th Cir.1971)). That continuity refers to the course the business enterprise takes, not to a continuous use of interstate travel to facilitate the business enterprise. *United States v. Tavelman*, 650 F.2d 1133, 1140 (9th Cir.1981), *cert. denied*, 455 U.S. 939, 102 S.Ct. 1429, 71 L.Ed.2d 649 (1982). There is no requirement that a violator of the Travel Act must participate repeatedly in the illegal enterprise, only that the enterprise itself be continuous in nature. *United States v. Kaiser*, 660 F.2d at 731. The

"business enterprise" involved in this case continued for almost three years. Moreover, even if "continuous illegal conduct" were required of every defendant, Bond's participation in three jackpot cheating incidents is sufficient to show "continuous illegal conduct" for a Travel Act conviction.

## X.

## SUFFICIENCY OF EVIDENCE

Brennan and Snider challenge the sufficiency of evidence for their convictions. Specifically, they contend that their convictions were based on the unreliable testimony of several prosecution witnesses.

Sufficient evidence supports a conviction if, viewing the evidence in the light most favorable to the prosecution, *"any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979); *United States v. McClendon*, 782 F.2d 785, 790 (9th Cir.1986).

### A. Brennan

 Brennan contends that insufficient evidence supports his convictions under 18 U.S.C. §§ 1952 and 2314 because the Government based its case solely upon the unreliable testimony of witnesses Durham, Coots, Revering, and Reel. The credibility of witnesses and the weight accorded the evidence are questions for the jury that are not reviewable. *United States v. Burns*, 701 F.2d 840, 842 (9th Cir.) (per curiam), *cert. denied*, 462 U.S. 1137, 103 S.Ct. 3123, 77 L.Ed.2d 1375 (1983). The testimony of these witnesses is not incredible merely because the witnesses participated in the alleged crimes. *See United States v. Casanova*, 642 F.2d 300, 301 (9th Cir.) (per curiam), *cert. denied*, 454 U.S. 899, 102 S.Ct. 401, 70 L.Ed.2d 215 (1981) (the testimony of an accomplice, if believed, is sufficient to sustain a conviction). Moreover, Brennan has not demonstrated that the testimony was inherently improbable, because the testimony was corroborated by circumstantial evidence of the slot machine cheating scheme. *See id.*

Brennan further contends there is insufficient evidence to convict him of aiding and abetting the interstate transportation of stolen money in violation of 18 U.S.C. § 2314 because he did not knowingly and willingly transport money interstate. To establish a violation of 18 U.S.C. § 2314, it is not necessary to show that Brennan himself actually transported any money; it is sufficient that he caused it to be done. *United States v. Gundersen*, 518 F.2d 960, 961 (9th Cir.1975) (quoting *Pereira v. United States*, 347 U.S. 1, 9, 74 S.Ct. 358, 363, 98 L.Ed. 435 (1954)). Furthermore, in order to prove that a defendant aided and abetted a crime, the Government need only show that the defendant intentionally associated himself with criminal activity and by his active participation sought to make it succeed. *United States v. McKoy*, 771 F.2d 1207, 1215 (9th Cir.1985). Intent can be inferred from circumstantial evidence. *United States v. Kaplan*, 554 F.2d 958, 964 (9th Cir.) (per curiam), *cert. denied*, 434 U.S. 956, 98 S.Ct. 483, 54 L.Ed.2d 315 (1977). Here, a witness named Revering testified that Brennan rode in the car with her from Reno to Sacramento after winning the $144,000 jackpot at Club Cal Neva on April 30, 1982. While in the car, Cullinen, a participant in the jackpot set-up, gave her $18,000 from the jackpot winnings and loaned her an additional $35,000, either to obtain gambling markers so that she could avoid paying income taxes on the $144,000 or to make a reasonable-appearing deposit to her bank. Thus, a reasonable jury could find that Brennan willingly participated in interstate transportation of stolen money. *See McKoy*, 771 F.2d at 1216.

### B. Snider

Snider contends that the testimony of Revering, Coots, and Jones was unreliable because they received immunity from prosecution and because their testimony was uncorroborated. Witness credibility, however, is a question for the jury that is not reviewable. *See Burns*, 701 F.2d at 842. Furthermore, the testimony of an accomplice, if believed, is sufficient to sustain a conviction. *Casanova*, 642 F.2d at 301. Thus, sufficient evidence supports Snider's conviction because of the weight of the evidence against her.

## XI.

## INEFFECTIVE ASSISTANCE OF COUNSEL

Cushing contends that he was denied effective assistance of counsel because the attorney who represented him before trial: (1) never challenged the indictment on Counts XVII and XVIII; (2) failed to challenge the federal jurisdiction of the court; (3) did not challenge the search of Cushing's home; and (4) withdrew on the eve of trial.

To establish ineffective assistance of counsel, a defendant must show: (1) that counsel failed to exercise the skill, judgment, or diligence of a reasonably competent attorney; and (2) that his failure resulted in prejudice to the defense so that it was reasonably likely to have altered the outcome. *Strickland v. Washington*, 466 U.S. 668, 687, 694, 104 S.Ct. 2052, 2064, 2068, 80 L.Ed.2d 674 (1984).

Here, Cushing fails to establish that the attorney's performance was inadequate or that he was prejudiced by his attorney's conduct. *See Strickland*, 466 U.S. at 687–96, 104 S.Ct. at 2064–69. First, although the attorney never challenged Cushing's indictment on Counts XVII and XVIII, the court dismissed these counts against Cushing before the trial began. Second, his failure to challenge the federal court's jurisdiction on the basis of Cushing's lack of knowledge that interstate travel was involved would not have affected the outcome of the trial for the reasons discussed above. Third, although he did not challenge the search of Cushing's house, Cushing has not shown that the evidence would have been suppressed or that there is a reasonable probability that he would have been acquitted had this evidence been excluded. *See United States v. Schaflander*, 743 F.2d 714, 720 (9th Cir. 1984) (per curiam), *cert. denied*, 470 U.S. 1058, 105 S.Ct. 1772, 84 L.Ed.2d 832 (1985). Moreover, there was overwhelming evi-

dence establishing Cushing's guilt independent of the evidence found in his house, including the testimony of several participant witnesses regarding his involvement in setting up the jackpots, W–2–G forms of the jackpot winnings, videotapes of Cushing opening a slot machine at the Barbary Coast Hotel in Las Vegas, airline tickets, hotel registration forms, apartment rental records, tampered slot machines, and slot machine payout slips. Finally, Cushing has not shown that the attorney's withdrawal on the eve of trial was reasonably likely to have altered the outcome of the trial. *See Strickland*, 466 U.S. at 691, 104 S.Ct. at 2066.

## XII.

### PRETRIAL PUBLICITY

██ Cushing contends that extensive media coverage of the case prejudiced him, and that the district court's denial of his motions for change of venue and sequestration of the jury denied him the right to a fair trial.

We review a district court's ruling on a change of venue motion and a motion to sequester the jury due to extensive media coverage for an abuse of discretion. *United States v. Birges*, 723 F.2d 666, 674 (9th Cir.), *cert. denied*, 466 U.S. 943, 104 S.Ct. 1926, 80 L.Ed.2d 472 and 469 U.S. 863, 105 S.Ct. 200, 83 L.Ed.2d 131 (1984); *Powell v. Spalding*, 679 F.2d 163, 166 (9th Cir.1982).

Reversal is warranted only if it can be shown "that the setting of the trial was inherently prejudicial or that the jury selection process ... permits an inference of actual prejudice." *Murphy v. Florida*, 421 U.S. 794, 803, 95 S.Ct. 2031, 2038, 44 L.Ed.2d 589 (1975); *Los Angeles Memorial Coliseum Com'n v. N.F.L.*, 726 F.2d 1381, 1399–1400 (9th Cir.), *cert. denied*, 469 U.S. 990, 105 S.Ct. 397, 83 L.Ed.2d 331 (1984). Cushing's argument that he was denied a fair trial rests entirely on the extensive media coverage that the case received. Cushing fails to cite any evidence—from the voir dire examination of the jurors or elsewhere—that demonstrates that a fair and unbiased jury could not be selected,

and there is no indication that the jury selected was not fair and impartial. *Cf. Dobbert v. Florida*, 432 U.S. 282, 303, 97 S.Ct. 2290, 2303, 53 L.Ed.2d 344 (1977). Extensive media coverage alone makes a trial setting inherently prejudicial only when it so pervades the trial atmosphere that the "trial atmosphere [is] utterly corrupted by press coverage." *Murphy*, 421 U.S. at 798, 95 S.Ct. at 2035; *see also Dobbert*, 432 U.S. at 303, 97 S.Ct. at 2303. We find no evidence that the trial below was a "media circus," or that the denial of Cushing's motions denied him a fair trial.

## XIII.

### PEREMPTORY CHALLENGES

The defense was granted ten peremptory challenges, with each defendant allowed to exercise one, and with the remaining two challenges to be exercised jointly. The defendants contend that the district court abused its discretion by refusing to grant them additional peremptory challenges due to the highly publicized nature of the case, the lack of consensus in exercising the two joint peremptory challenges, and because the court attempted to coerce them to stipulate to a proposed plan to increase the number of peremptory challenges.

██ There is no right to additional peremptory challenges in multi-defendant cases. *United States v. McClendon*, 782 F.2d 785, 787 (9th Cir.1986). The award of additional peremptory challenges is not mandatory, but permissive, and rests in the trial court's sound discretion. *Id.; see also* Fed.R.Crim.P. 24(b). Moreover, a deadlock over the use of the defendants' joint peremptory challenges "does not mandate a grant of additional challenges unless defendants demonstrate that the jury ultimately selected is not impartial or representative of the community." *Id.* at 788. Because the defendants have not shown that the jury chosen was partial or not representative of the community, the district court did not abuse its discretion in refusing to grant additional peremptory challenges.

██ The defendants' other contention is that the district court attempted to coerce

them into accepting a plan to give each defendant an additional peremptory challenge if they would stipulate that the Government receive six additional challenges. This proposal is not an abuse of discretion because it is within the trial court's discretion to condition the grant of additional peremptory challenges to the defendants upon a stipulation for more peremptory challenges to the Government. *See United States v. Tucker,* 526 F.2d 279, 283 (5th Cir.), *cert. denied,* 425 U.S. 958, 96 S.Ct. 1738, 48 L.Ed.2d 203 (1976). The defendants, with the exception of John Vaccaro and Patti Lane, consented to this order and entered into a stipulation that they would each get ten individual and ten joint challenges, with the Government receiving twelve challenges instead of the six it would otherwise have. The court's proposed order, however, was not adopted because of Vaccaro's and Lane's objections. The court then adopted the Fed.R.Crim.P. 24(b) guidelines allowing ten peremptory challenges for the defendants and six for the Government. *See* Fed.R.Crim.P. 24(b). This use of the Rule 24(b) guidelines is within the discretion of the court and was not impermissible coercion. *See McClendon,* 782 F.2d at 787–788.

## XIV.

### EXCLUSION OF BLACK VENIREMEN

The Vaccaros and Snider contend that the prosecutor's exercise of peremptory challenges to exclude the only two black veniremen violated their Sixth Amendment rights.

 In *Batson v. Kentucky,* —— U.S. ——, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986), the Supreme Court formulated a test for proving purposeful discrimination in the selection of a jury. To establish a prima facie case, the defendant must show that the facts and circumstances of the jury selection raise an inference of discriminatory exclusion by the prosecutor. *Id.* 106 S.Ct. at 1723. The defendants rely on one example provided by the Supreme Court, that of a "pattern" of strikes against black jurors. *Id.*

 We conclude that striking just two jurors does not constitute such a pattern indicating a systematic exclusion of blacks. Even if it did, however, we find that the Government has expressed a neutral, reasonable basis for challenging the black jurors. At trial, the prosecutor stated his reasons for exclusion. One prospective juror had a brother who was in prison for a robbery conviction. The prosecutor felt that the other prospective juror had a poor attitude in answering voir dire questions. Both of these reasons are proper, because a prosecutor may use peremptory challenges when he cannot formulate and sustain a legal objection to a juror, and yet has reason to question the impartiality of a juror due to his habits and associations. *Hayes v. Missouri,* 120 U.S. 68, 70, 7 S.Ct. 350, 351, 30 L.Ed. 578 (1887); *Weathersby v. Morris,* 708 F.2d 1493, 1496–97 (9th Cir. 1983), *cert. denied,* 464 U.S. 1046, 104 S.Ct. 719, 79 L.Ed.2d 181 (1984). Furthermore, in *Batson,* the Court stated that in order to establish a prima facie case a defendant must show that he or she is a member of a cognizable racial group and that the prosecutor has excluded members of *that* racial group from the jury through the exercise of peremptory challenges. *Batson,* 106 S.Ct. at 1723. Neither the Vaccaros nor Snider are black. Therefore, under *Batson,* they could not have made out a prima facie case of discrimination in juror selection in any event.

## XV.

### SENTENCING OF JOHN VACCARO

Shortly before sentencing, the attorney for Bond and the prosecutor had a side-bar conference with the judge. The thrust of the statements by Bond's attorney was that Bond had not accepted an opportunity to plead guilty and cooperate with the Government because he was informed that there was a "contract" on his life. Thus, he argued that Bond's sentence should not be any greater than those who did cooperate. During the conversation, there was some vague speculation that John Vaccaro could have been the person behind the "contract." The prosecutor discounted the threat and Bond's alleged fear and pointed out that during the trial, "I've seen him eating dinner with John Vaccaro during the trial and that sort of thing."

458

John Vaccaro contends that he was prejudiced by the Government's ex parte communications with the trial judge just prior to his sentencing. He argues that these communications constitute prosecutorial misconduct, and that they influenced the district judge to increase Vaccaro's sentence. Vaccaro points to the fact that he received the longest sentence, nine years, whereas Cushing, the other major conspirator, only received a seven-year sentence. However, given the evidence of Vaccaro's leadership in the scheme, it is not unreasonable that he received the longest sentence. Given the equivocal nature of the statements to the court, it is highly doubtful they could have had any effect on the sentencing decision of the district judge. It is within the discretion of the court to impose disparate sentences as long as the judge takes into account individual circumstances. *United States v. Chiago*, 699 F.2d 1012, 1014 (9th Cir.), *cert. denied*, 464 U.S. 854, 104 S.Ct. 171, 78 L.Ed.2d 154 (1983). There is no indication that the district judge gave any weight to this conversation in sentencing John Vaccaro.

The judgments are AFFIRMED.