62 F.3d 1426
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Willis Tommie HALL, Defendant-Appellant.
 No. 93-30418.
 United States Court of Appeals, Ninth Circuit.
 Submitted April 13, 1995.*
Decided Aug. 1, 1995.
 
 Before: POOLE, BOOCHEVER, and WIGGINS, Circuit Judges.
 
 
 1
 MEMORANDUM**
 
 
 2
 Willis Tommie Hall appeals his conviction for conspiracy to manufacture and/or possess with intent to distribute methamphetamine, in violation of 21 U.S.C. Secs. 841(a) and 846, and for manufacture of and/or possession with intent to distribute methamphetamine, in violation of 21 U.S.C. Sec. 841(a). On appeal, Hall raises a number of challenges to his conviction and sentence. We affirm.
 
 DISCUSSION
 
 3
 I. The District Court Did Not Abuse Its Discretion in Denying Hall's Motion to Dismiss Due to Pre-indictment Delay
 
 
 4
 The indictment in this case was filed on March 18, 1992, over three and one-half years after the alleged manufacturing incident took place in the shed on Robert Swain's property. Hall filed a motion to dismiss on the ground that the pre-indictment delay violated his due process rights. The district court denied the motion. Hall argues that this was error.
 
 
 5
 The denial of a motion to dismiss for impermissible pre-indictment delay is reviewed for an abuse of discretion. United States v. Butz, 982 F.2d 1378, 1380 (9th Cir.), cert. denied, 114 S. Ct. 250 (1993). The court must apply a two-prong test to determine whether pre-indictment delay denied due process: "(1) the defendant must prove actual, non-speculative prejudice from the delay; and (2) the length of the delay, when balanced against the reason for the delay, must offend those fundamental conceptions of justice which lie at the base of our civil and political institutions." United States v. Huntley, 976 F.2d 1287, 1290 (9th Cir. 1992) (quotations and citations omitted).
 
 
 6
 Under the first prong, the defendant has a "heavy burden" to prove that the delay caused "actual prejudice." Butz, 982 F.2d at 1380. In the instant case, Hall argues that he has suffered actual prejudice in the following ways: physical evidence such as the shed and the items inside were no longer available for Hall to prove the lack of his fingerprints on any of the items; the metal tools inside the shed were no longer available for Hall to rebut Swain's testimony that there was corrosion on them; and the witnesses' memories had faded over time.
 
 
 7
 These allegations of prejudice, however, are not sufficient to establish actual prejudice. We "apply the actual prejudice test stringently." Id.; see, e.g., United States v. Sherlock, 962 F.2d 1349, 1354 (9th Cir.) (no actual prejudice from three-year delay and loss of testimony and physical evidence) (as amended), cert. denied, 113 S. Ct. 419 (1992).[1] Hall has not indicated how the witnesses would have testified had their memories not dimmed, nor does he identify any other witnesses who were rendered unavailable by the delay. The prejudice suffered by Hall in that the shed and the items inside were no longer available was also suffered by the government because it could not prove that Hall's fingerprints were inside the shed. Hall has not met his heavy burden of showing actual prejudice, and, therefore, we need not reach the second part of the pre-indictment delay test. See Butz, 982 F.2d at 1380.
 
 
 8
 We find that the district court did not abuse its discretion in denying Hall's motion to dismiss for pre-indictment delay.
 
 
 9
 II. The District Court Did Not Err in Denying Hall's Rule 29 Motion for Acquittal
 
 
 10
 Hall argues that the district court should have granted his Rule 29 motion for acquittal because there was insufficient evidence to support his conviction.
 
 
 11
 In considering a challenge to the sufficiency of the evidence, a reviewing court must determine whether, after viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See United States v. Shirley, 884 F.2d 1130, 1134 (9th Cir. 1989). All reasonable inferences from the evidence must be drawn in favor of the government, United States v. Federico, 658 F.2d 1337, 1343 (9th Cir. 1981), and the court must assume that the jury resolved all matters in a manner which supports the verdict. United States v. Garza, 980 F.2d 546, 552 (9th Cir. 1992).
 
 
 12
 The government's evidence at trial consisted primarily of the testimony of four witnesses: James Fitzhugh, Robert Swain, Pamela Swain, and Denise Fitzhugh. James Fitzhugh testified that he met Hall in May 1988, and that after a few discussions, he and Hall agreed to manufacture and sell methamphetamine together. Fitzhugh admitted that he had prior experience in selling marijuana and cocaine.
 
 
 13
 Fitzhugh testified that he contacted Robert and Pamela Swain, and arranged to use an old shed on their property to manufacture the methamphetamine. Fitzhugh and Hall together drove out to the Swain property. Fitzhugh detailed the chemicals and equipment they took with them, and he described the process they followed in cooking the drugs in the shed. He stated that at one point they ran out of R11 solvent and went into the Swain home to call a number of refrigeration companies in town to obtain more. This testimony was corroborated by phone toll records which indicated that calls had in fact been made that day from the Swain home to three such companies. Fitzhugh testified that after the cook was substantially finished, he called Denise Fitzhugh and had her come to the Swain property to help them remove the equipment and the drugs from the property. Fitzhugh later finished cooking the methamphetamine in his garage. He testified that he sold approximately twelve ounces of the drug, and Hall sold the remaining fourteen ounces.
 
 
 14
 The other witnesses at trial largely confirmed Fitzhugh's version of the facts. Robert Swain testified that he agreed to let Fitzhugh use his property. Swain indicated that the day after Fitzhugh and Hall arrived, he saw them both in his shed, and he observed "tubes and a low table and some buckets and [what] looked like a chemistry experiment." Swain recalled that at one point, Hall offered him a taste of the methamphetamine they had been cooking. Swain stated that the day after Hall and Fitzhugh left, he noticed a sour chemical smell coming from the shed. He also found corrosion on a number of his metal tools in the shed. Swain testified that he did not make the phone calls to the refrigeration companies or to Denise Fitzhugh, which were on the phone records for the dates in question.
 
 
 15
 Pamela Swain confirmed that Hall and Fitzhugh used the shed on her property. Denise Fitzhugh confirmed that Fitzhugh called her after he and Hall were finished manufacturing the drugs and that she then took a pick-up truck to the Swain property to help them remove the drugs and the equipment. She testified that she used some of the drug afterwards and that it was in fact methamphetamine.
 
 
 16
 Hall testified in his own defense. He stated that he drove with Fitzhugh to the Swain property in order to do some fishing. He testified that while Fitzhugh was in the shed for most of the time they were there, Hall rested, took naps on the couch, and took a long walk down the river. Hall flatly denied manufacturing methamphetamine at the Swain property.
 
 
 17
 Taken altogether, the evidence is sufficient to establish beyond a reasonable doubt that Hall in fact was involved in conspiring to manufacture methamphetamine and in manufacturing the drug. Hall suggests that the witnesses' testimony was not credible because each witness was either an admitted drug user or drug seller who agreed to testify and cooperate with the government for his or her own interests. The government concedes that it "took dopers to testify against a doper." However, the fact that government witnesses may be known drug dealers or accomplices in a crime goes to the weight of the evidence, rather than the sufficiency of the evidence. See United States v. Vaccaro, 816 F.2d 443, 454 (9th Cir.) (testimony of witness not incredible merely because witness participated in the alleged crimes), cert. denied, 484 U.S. 914 (1987); United States v. Limones, 8 F.3d 1004, 1009 (5th Cir. 1993), cert. denied, 114 S. Ct. 1543 (1994).
 
 
 18
 Moreover, questions of credibility are for the jury to decide and generally are not reviewable on appeal. See United States v. Hodges, 770 F.2d 1475, 1478 (9th Cir. 1985). Although a government witness may be "an unsavory character, ... the jury ha[s] the right to believe his testimony." United States v. Cook, 608 F.2d 1175, 1182 (9th Cir. 1979), cert. denied, 444 U.S. 1034 (1980). The jury was also entitled to discredit Hall's own testimony.
 
 
 19
 Viewing the evidence in the light most favorable to the government, we find that the evidence was sufficient to support Hall's conviction. The district court did not err in denying Hall's Rule 29 motion for acquittal.
 
 
 20
 III. The District Court Did Not Err in Denying Hall's Motion to Dismiss or for a New Trial Based on a Brady Violation
 
 
 21
 Hall argues that the district court should have granted his motion for dismissal or for a new trial because the government, in failing to disclose information that could have been used to impeach Fitzhugh's testimony, violated the Brady rule.
 
 
 22
 Challenges to a conviction based on alleged Brady violations are reviewed de novo. United States v. Woodley, 9 F.3d 774, 777 (9th Cir. 1993) (as amended). Brady requires the government to disclose evidence that is "favorable to an accused ... where the evidence is material either to guilt or to punishment." Brady v. Maryland, 373 U.S. 83, 87 (1963). Evidence impeaching a government witness' testimony "falls within the Brady rule when the reliability of the witness may be determinative of a criminal defendant's guilt or innocence." United States v. Brumel-Alvarez, 991 F.2d 1452, 1458 (9th Cir. 1992) (as amended).
 
 
 23
 At trial, the government's key witness, Fitzhugh, testified that he did not get involved in the sale or use of methamphetamine until he began manufacturing it with Hall in July 1988. Hall discovered, however, that one week after the trial, Fitzhugh testified in another case, United States v. Dudden, that he used and sold methamphetamine in February, 1988. Because the same prosecutor tried both cases, Hall argues that the government knew about Fitzhugh's prior involvement with methamphetamine and deliberately failed to reveal this evidence which would have impeached Fitzhugh's testimony. Hall contends that the government knowingly used Fitzhugh's false testimony to mislead the jury into believing "that Hall was the person who essentially brought [Fitzhugh] back into the drug business, and that Hall was the primary force behind the alleged methamphetamine conspiracy."
 
 
 24
 Because the same prosecutor tried the Dudden case within one week of Hall's trial, the prosecutor may well have been aware that Fitzhugh's testimony in Hall's trial was not consistent with the testimony he would give one week later in Dudden. Therefore, upon first glance, it appears that the government had an obligation to disclose this impeachment evidence to Hall. Brady, however, requires that such evidence be disclosed only if it is "material." When the prosecution "knowingly uses perjured testimony ... or knowingly fails to disclose that testimony used to convict a defendant was false," the evidence is material and the conviction cannot stand "if there is any reasonable likelihood that the false testimony could have affected the jury verdict." United States v. Endicott, 869 F.2d 452, 455 (9th Cir. 1989). Therefore, the critical question is whether or not the evidence was material.
 
 
 25
 The government argues that Fitzhugh's false testimony and/or the evidence showing the falsity of Fitzhugh's testimony was not material to the outcome because it merely went to the credibility of Fitzhugh's testimony. Fitzhugh's credibility, however, was already highly suspect because he freely admitted at trial that he had perjured himself to protect his own interests in earlier court proceedings. Moreover, it was clear that Fitzhugh had an extensive history of illegal drug involvement. He testified that he had been involved with the use and sale of illegal drugs for approximately twenty-five years. Therefore, the government argues that the evidence showing additional undisclosed drug involvement and an additional lie was not material and would have been merely cumulative, because there was ample other evidence at trial to undermine Fitzhugh's credibility.
 
 
 26
 Hall counters that none of the other impeachment evidence related specifically to Fitzhugh's testimony about his involvement with Hall and the methamphetamine transactions in this case. Hall argues that he needed the evidence to rebut Fitzhugh's version of how Fitzhugh initially became involved in the use and sale of the drug.
 
 
 27
 Viewed in the context of the entire record, the impeachment evidence was not as material to the jury's verdict as Hall suggests. It does not matter who initially conceived of the conspiracy to manufacture the methamphetamine. As we have set forth in the preceding section, there was a great deal of other evidence at trial establishing Hall's guilt.
 
 
 28
 We find that the impeachment evidence was not material to the outcome of the trial. Because Fitzhugh's credibility was already highly questionable, and because there is no indication that additional impeachment evidence would have affected the jury's decision, a new trial was not warranted. See United States v. Anzalone, 886 F.2d 229, 233 (9th Cir. 1989) (defendant not entitled to disclosure of government witness' presentence report where defendant had access to witness' criminal record and witness' prior false testimony under oath; impeachment evidence in report would be cumulative); Endicott, 869 F.2d at 456 (new trial unwarranted where new evidence that government witness was promised more money than previously disclosed was cumulative); United States v. Steel, 759 F.2d 706, 714 (9th Cir. 1985) (denial of motion for new trial proper where new evidence that government witness perjured himself probably would not have affected jury's assessment of his credibility.[2]
 
 
 29
 IV. Hall Received Effective Assistance of Counsel During His Trial
 
 
 30
 Hall argues that he received ineffective assistance of counsel because his attorney failed to cross-examine vigorously the government's key witness, Fitzhugh.
 
 
 31
 Claims of ineffective assistance of counsel are reviewed de novo. United States v. Olson, 925 F.2d 1170, 1173 (9th Cir. 1991). To prevail on this claim, a defendant must show that his counsel's performance was deficient and that the deficiency prejudiced his defense. See Strickland v. Washington, 466 U.S. 668, 687 (1984). Deficient performance is demonstrated when counsel's performance "fell below an objective standard of reasonableness," and prejudice is established when "there is a reasonable possibility that, but for [the] attorney's errors, the verdict would have been different." United States v. Solomon, 795 F.2d 747, 749 (9th Cir. 1986). There is "a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 689.
 
 
 32
 Hall's claim that his attorney failed to conduct a thorough cross-examination of Fitzhugh is unconvincing. During cross-examination, Hall's attorney got Fitzhugh to admit that he had lied under oath a number of times in the past in connection with charges brought against him for illegal drug involvement. Counsel also brought out Fitzhugh's extensive history of violating the law, including illegal gambling, tax evasion, and drug distribution. Moreover, counsel pressed Fitzhugh to explain the scope of his immunity agreement and suggested Fitzhugh's possible biases in testifying against Hall.
 
 
 33
 In light of this extensive cross-examination and attempted impeachment of Fitzhugh's credibility, counsel's performance cannot be said to have fallen outside the wide range of professional assistance demanded of criminal attorneys. Hall argues that his attorney should have confronted Fitzhugh with prior indictments filed against him in order to provide the jury with further background of the "massive drug organization that Fitzhugh belonged to." Hall's suggestions for how the cross-examination might have been handled differently, however, are insufficient to support his ineffective assistance of counsel claim. Trial strategy or a "tactical decision by counsel with which the defendant disagrees cannot form the basis of a claim of ineffective assistance of counsel." Guam v. Santos, 741 F.2d 1167, 1169 (9th Cir. 1984) (per curiam).
 
 
 34
 Because we find that counsel's performance did not fall "below an objective standard of reasonableness," we need not address the prejudice prong of the ineffective assistance of counsel claim. See Olson, 925 F.2d at 1173. We find that Hall was not deprived of effective assistance of counsel at trial.
 
 
 35
 V. The District Court Did Not Err in Basing Hall's Sentence on a Finding that the Drug Manufactured Was D-methamphetamine Rather Than L-methamphetamine
 
 
 36
 Methamphetamine exists in two different isomeric forms. L-methamphetamine is a compound that "produces little or no physiological effect when ingested." United States v. Bogusz, 43 F.3d 82, 89 (3d Cir. 1994), cert. denied, 115 S. Ct. 1812 (1995). D-methamphetamine, on the other hand, has a much more potent physiological effect and produces the "high" sought by its users. Id. This difference is reflected in the Sentencing Guidelines which impose a significantly harsher sentence for D-methamphetamine than for L-methamphetamine. See U.S.S.G. Sec.2D1.1. (Drug Equivalency Table).
 
 
 37
 In this case, the district court sentenced Hall to 78 months imprisonment based on a finding that the methamphetamine manufactured was D-methamphetamine, which called for a base offense level of 26. Had the district court found that L-methamphetamine rather than D-methamphetamine had been involved, Hall's base offense level would have been 18, which provides for a sentencing range of only 27-33 months. Hall argues that he should have been sentenced within the lower sentencing range because there was no evidence to indicate that the drug was actually D-methamphetamine.
 
 
 38
 The district court's factual findings at sentencing are reviewed for clear error. United States v. Chapnick, 963 F.2d 224, 226 (9th Cir. 1992). The government has the burden of proving the quantity and type of controlled substances involved by a preponderance of the evidence at sentencing. See United States v. Kipp, 10 F.3d 1463, 1465 (9th Cir. 1993); United States v. Patrick, 983 F.2d 206, 208 (11th Cir. 1993).
 
 
 39
 Because this was a "no dope" case, the government could not directly test the methamphetamine to determine whether it was D-methamphetamine or L-methamphetamine. The government did present evidence, however, by forensic chemist Phyllis Quinn, to indicate that the drug manufactured by Hall and Fitzhugh was in all likelihood D-methamphetamine. At trial, Quinn testified that there were two basic methods of making methamphetamine in clandestine labs: the P2P method and the Ephedrine HI method. The Ephedrine HI process requires the use of hydrochloric acid or gas which, when reacting with the air, produces a very "corrosive atmosphere" that will corrode any metal surface. This description bolstered Robert Swain's testimony that after Hall and Fitzhugh had used his shed, a number of the metal tools in his shed had been corroded.
 
 
 40
 At sentencing, Quinn submitted an affidavit stating that the Ephedrine process is used to produce D-methamphetamine. Quinn indicated that she had participated in over thirty-five seizures of clandestine labs and had encountered only one [L] - methamphetamine lab in all of her experience. She explained that because "L-methamphetamine has lower abuse potential and a lower stimulant activity, it does not have any real market value and it is not reasonable to expect a clandestine laboratory to produce L-methamphetamine." Quinn also stated that she had reviewed Fitzhugh's testimony describing the chemicals he and Hall used to manufacture the drug and that these chemicals were common precursors to D-methamphetamine:
 
 
 41
 I have reviewed the testimony of James B. Fitzhugh ... Mr. Fitzhugh refers to Iodine and Hydriodic Acid. He also refers to Sodium thiosulphate on several occasions. These chemicals are commonly used in the Ephedrine process which produce the [D] -Methamphetamine.
 
 
 42
 The government argues that this evidence proved by a preponderance of the evidence that the methamphetamine manufactured by Hall and Fitzhugh was D-methamphetamine.
 
 
 43
 We agree. While some amount of "proof" is required to "justify the added deprivation of liberty that follows the scoring of the drug as D-methamphetamine," Patrick, 983 F.2d at 209[3], the government need not prove by direct evidence that the drug involved is D-methamphetamine. "[C]ircumstantial evidence of which isomer is present may be sufficient to meet the preponderance of the evidence standard." Bogusz, 43 F.3d at 92; see, e.g., United States v. Lande, 40 F.3d 329, 331 (10th Cir. 1994) (affirming D-methamphetamine determination based on affidavits of forensic chemists stating that they had never encountered clandestine lab producing L-methamphetamine (which has little stimulating effect), and on testimony of user that methamphetamine obtained from defendant had a strong stimulating effect which kept him up for two to three days) cert. denied, 115 S. Ct. 1988 (1995); United States v. Koonce, 884 F.2d 349, 352-53 (8th Cir. 1989) (affirming D-methamphetamine determination based on circumstantial evidence that a related shipment of drugs had actually contained D-methamphetamine).
 
 
 44
 In the instant case, the government presented evidence that the chemicals used by Hall were those used in the Ephedrine method of producing D-methamphetamine. Denise Fitzhugh also testified that she ingested some of the methamphetamine that was manufactured, and she affirmed that it kept her "up for long periods of time." Because L-methamphetamine does not produce such a physiological effect, the evidence indicates that the methamphetamine manufactured was more likely than not D-methamphetamine. Thus, the government carried its burden of proving by a preponderance of the evidence that Hall manufactured D-methamphetamine rather than L-methamphetamine.
 
 
 45
 Therefore, the district court did not clearly err in finding that D-methamphetamine was involved and in calculating Hall's sentence on that basis.
 
 CONCLUSION
 
 46
 Accordingly, we affirm Hall's conviction and sentence. AFFIRMED.
 
 
 
 *
 The panel unanimously finds this case suitable for submission without oral argument pursuant to Fed. R. App. P. 34(a) and 9th Cir. R. 34-4
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir. R. 36-3
 
 
 [1]
 See also United States v. Mills, 641 F.2d 785, 789 (9th Cir.) (as amended) (no actual prejudice from loss of physical evidence because even if government had indicted defendants one month after crime, the physical evidence still could have been unavailable), cert. denied, 454 U.S. 902 (1981); United States v. Pallan, 571 F.2d 497, 501 (9th Cir.) (no actual prejudice from five-year delay and death of witness), cert. denied, 436 U.S. 911 (1978)
 
 
 [2]
 Hall briefly argues that the government violated the Jencks Act by failing to disclose the DEA summaries describing Fitzhugh's February 1988 involvement in methamphetamine transactions. The DEA summaries, however, do not constitute Jencks material because they are not "written statement[s] made by [a] witness and signed or otherwise adopted or approved by him," as required by the statute. See 18 U.S.C. Sec. 3500(e)(1); United States v. Claiborne, 765 F.2d 784, 801 (9th Cir. 1985) (summaries of interviews conducted by FBI agents with witness were not statements subject to Jencks disclosure rule where witness did not draft summaries or otherwise approve their contents), cert. denied, 475 U.S. 1120 (1986). Even if a Jencks error had occurred, a conviction must be affirmed if the error was more likely than not harmless. See United States v. Span, 970 F.2d 573, 582 (9th Cir. 1992), cert. denied, 113 S. Ct. 1283 (1993). For the reasons previously discussed, the impeachment evidence was merely cumulative, and there was no indication that the failure to disclose it had any effect on the jury's assessment of Fitzhugh's credibility or on the jury's verdict
 
 
 [3]
 See also United States v. Deninno, 29 F.3d 572, 580 (10th Cir. 1994) (cannot assume conviction based on D-methamphetamine when no evidence that was presented at trial or at sentencing indicated type of drug involved), cert. denied, 115 S. Ct. 1117 (1995)