**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Milton Donovan OLSON,**
**Defendant–Appellant.**

**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Bryan D. OLSON, Defendant–Appellant.**

Nos. 89–30220, 89–30224.

United States Court of Appeals,
Ninth Circuit.

Argued and Submitted Dec. 5, 1990.

Decided Feb. 12, 1991.

C. James Frush, Helsell, Fetterman, Martin, Todd & Hokanson, Seattle, Wash., for defendant-appellant Milton Donovan Olson, Michael G. Martin, Chief Asst. Federal Public Defender, Seattle, Wash., for defendant-appellant Bryan D. Olson.

Harry J. McCarthy, Asst. U.S. Atty., Seattle, Wash., for plaintiff-appellee.

Before GOODWIN, WRIGHT and NOONAN, Circuit Judges.

EUGENE A. WRIGHT, Circuit Judge:

Milton Donovan Olson (Don Olson) and his son Bryan Olson became codefendants after their indictment for multiple counts of mail fraud. Father was convicted as a principal, under 18 U.S.C. § 1341. Son was convicted of aiding and abetting his father in violation of 18 U.S.C. § 2. Both appeal.

Don Olson attacks the quality of his representation at trial, arguing that it violated his sixth amendment right to counsel. He further contends that the indictment was amended at trial, permitting him to be convicted on a theory not charged. Bryan Olson argues only that the evidence was insufficient to establish his specific intent to defraud.

## BACKGROUND

In 1983, Don Olson started a small business in Seattle called Rest–O–Pedic. It used direct mail advertising and in-home sales presentations to sell adjustable beds to customers throughout the United States. The beds were delivered to its customers directly from the manufacturer, a Pennsylvania firm, Sci–O–Tech.

Bryan Olson began to work for his father at Rest–O–Pedic in 1985. During the last half of 1986 (the period under indictment), Bryan Olson was in charge of customer relations.

In its customer communications, Rest–O–Pedic repeatedly used three form letters signed by a nonexistent "Ted Wayne" of "Customer Service." The first informed the customer that a shipping date had been established. The second told the customer that the bed would be delayed because a final inspection had revealed a minor defect in a back-ordered part. The third letter said that the factory had received the back-ordered part and that a new shipping date had been established. Evidence indicated that these letters were mailed to customers as a matter of office routine rather than as accurate reports about the progress of orders.[1]

Some customers who received Ted Wayne letters ultimately received their beds and were satisfied. But many Rest–O–Pedic customers were not so fortunate. The government adduced evidence that more than 100 customers paid Rest–O–Pedic more than $290,000 for beds never delivered. Evidence further showed that customers' funds were spent on other business and personal uses, not for beds.[2] Many of

---

1. Don Olson testified that the first Ted Wayne letter "went out pretty much on a systematic basis." The government's evidence showed that in several instances, customers who purchased beds on the same dates received the same sequence of Ted Wayne letters, and that each letter in the sequence bore the same date. A Sci–O–Tech manager who had inspection and troubleshooting responsibilities testified that no defect like the one asserted in the Ted Wayne letters had ever been brought to his attention.

2. Rest–O–Pedic operated on a "cash in, cash out" basis and had no system of financial controls. It had no line of credit with Sci–O–Tech, and had to pay for the beds ordered before the manufacturer would fill the order. It encouraged its customers to pay cash immediately for their beds, but the evidence indicated that it often used current sales proceeds to pay for advertising or for beds ordered by earlier customers.

the victimized customers received Ted Wayne letters.

Unlike his father, Bryan Olson neither presented evidence nor testified in his own defense. At the end of the government's case, he moved for a judgment of acquittal. Judge Dwyer reserved his ruling. *See* Fed. R.Crim.P. 29(b). The jury acquitted the younger Olson on one count but found him guilty on thirteen others. The judge later denied the acquittal motion.

The jury found Don Olson guilty on all fourteen counts. He wrote to Judge Dwyer the following day, complaining that his representation at trial had been "extremely inadequate and almost to the point of no defense at all." Judge Dwyer permitted Don Olson's trial counsel to withdraw and appointed new counsel.

Don Olson's new attorney moved for a new trial, arguing that trial counsel had rendered ineffective assistance. Judge Dwyer held a two-day hearing on the motion. He received 24 defense exhibits and heard extensive testimony from witnesses, including both Don Olson and his trial attorney.

Several defense witnesses who had appeared at trial testified during the motion hearing that counsel did not adequately prepare them for trial. A private investigator thought his effectiveness in assisting Olson's defense was impaired, partly because of inadequate guidance from trial counsel. Another witness told of giving trial counsel evidence of a dishonest act by a government witness. Trial counsel did not use this evidence for impeachment.

The 24 defense exhibits, which had not been presented at Olson's trial, included three letters from Rest–O–Pedic customers indicating that they had experienced various mechanical problems with their beds. One such letter thanked Rest–O–Pedic for its help in resolving the problem. Other customer letters introduced at the motion hearing expressed satisfaction.

Olson testified at the motion hearing that he had asked trial counsel for copies of documents from the government, but had never received them. He described how he worked with the defense accountant to create a rebuttal exhibit, despite discouragement from and nonparticipation by trial counsel. Olson acknowledged having disagreed with some of trial counsel's tactical decisions, and he indicated that he was unaware of some efforts that trial counsel had made to uncover favorable evidence. Olson blamed his conviction on counsel and rejected the possibility that the jury simply did not believe his testimony.

Olson waived the attorney-client privilege, enabling trial counsel to testify at the motion hearing in some detail. Trial counsel said he had recurrent difficulties in getting Olson to focus on the important legal issues. He testified that although he repeatedly tried to corroborate that the beds were defective, as Olson represented, he was ultimately unable to do so. He explained that he did not use the evidence of the government witness's prior dishonesty to impeach her because the incident was completely collateral.

Trial counsel admitted that he overlooked making a *Brady* [3] request, contrary to his usual practice in defending a criminal case. He indicated that he did not adopt a satisfied customer theme in defense because it might have backfired. His conversations with some "satisfied" Rest–O–Pedic customers disclosed "a pattern of . . . pressure tactics" that he viewed as "detrimental to the ultimate defense of Mr. Olson's case."

At the end of the second day of the hearing, Judge Dwyer orally denied Olson's new trial motion. He found that while trial counsel had not "function[ed] at 100 percent effectiveness," the case against Don Olson was so strong that a conviction would have followed even the most brilliant of defenses.

---

Evidence also showed that during the first half of 1986 Rest–O–Pedic experienced an unusually high volume of dishonored customer checks. By August 1986, the business was effec-

tively bankrupt. It had spent its cash receipts and had a large liability for undelivered beds.

**3.** *See Brady v. Maryland,* 373 U.S. 83, 87, 83 S.Ct. 1194, 1196–97, 10 L.Ed.2d 215 (1963).

## DISCUSSION

### I. Don Olson: Did Trial Counsel Render Ineffective Assistance?

Olson attacks virtually every facet of counsel's performance. He criticizes counsel for lacking experience with criminal defense in general[4] and with mail fraud in particular. He catalogs ways in which he says the performance of counsel was deficient. These include the failure to make any pretrial motions or request formal discovery, the allegedly inadequate preparation of witnesses and for trial, not using opportunities to impeach prosecution witnesses and to undermine the government's case, and alleged failures to keep Olson properly informed and to communicate effectively with him.

Whether counsel rendered ineffective assistance is a mixed question of law and fact that we review de novo. *See Strickland v. Washington*, 466 U.S. 668, 698, 104 S.Ct. 2052, 2070, 80 L.Ed.2d 674 (1984). We review the district court's underlying findings of fact for clear error. *See id.* We must consider the totality of the evidence and of the circumstances. *Id.* at 688, 695, 104 S.Ct. at 2064–65, 2068–69. We must also "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *Id.* at 689, 104 S.Ct. at 2065.

*Strickland* established a two-pronged test for determining if counsel rendered ineffective assistance. Under this test, the defendant must establish both deficient performance and resulting prejudice. 466 U.S. at 687, 104 S.Ct. at 2064. We need not address both prongs if the defendant makes an insufficient showing about one. *Id.* at 697, 104 S.Ct. at 2069–70. Like Judge Dwyer, we begin by considering the prejudice prong.

■ The prejudice prong of *Strickland* ensures that the sixth amendment guarantee of counsel fulfills its purpose of assuring that criminal trials produce reliable outcomes. *Id.* at 691–92, 104 S.Ct. at 2066–67.

Our inquiry is whether "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. at 2068. A "reasonable probability" is "a probability sufficient to undermine confidence in the outcome." *Id.*

After independently reviewing Olson's presentation, we find that we cannot improve upon the thoughtful analysis made by Judge Dwyer when he denied the new trial motion. He began by stating that "[t]here is no doubt in my mind that the result of the trial was reliable." He supported this conclusion by analyzing the evidence:

> [T]here is no doubt that these adjustable bed customers were told that if they ordered beds and paid cash, that the beds would be ordered and the delivery date would be thus and such. A certain specified date. There is no doubt that these orders were solicited and taken pursuant to a practice which systematically put off the ordering of the beds beyond the dates that were promised.
>
> Each of the customers at issue testified to basically the same story, and this story really was not contested. What it amounted to was that the bed was ordered, the cash was paid, the dates were promised, and then there ensued a series of letters....
>
> Now, during this whole process, the bed had not even been ordered, and that's uncontested, too.
>
> So looking at that evidence, even from the defendant's point of view, what do you have? You have a pattern of conduct in which at the very least each of these customers was being fraudulently deprived of the use of his or her money.

Judge Dwyer then considered Olson's defenses. He first noted that evidence Rest–O–Pedic began as an honest business "would not be a defense if the business later became fraudulent under financial pressure, which clearly is what the jury found happened." As to Olson's defense

---

4. This criticism lacks factual support. At the time of the motion hearing, trial counsel had been a member of the bar for more than ten years and had tried "hundreds" of criminal cases.

that he had always intended to deliver each bed, Judge Dwyer observed that the jury could easily have disbelieved Olson. He concluded that even accepting Olson at his word

> would have inevitably led ... any jury to the finding that the defendant had the specific intent to at least temporarily defraud customers of their property by depriving them of the use of their funds....

> Mr. Olson testified today that the use of these delay letters was a foolish mistake. Certainly that was true, but it was a mistake of a nature that made it virtually inevitable, in my judgment, that no matter how thorough the defense, no matter how brilliant the defense, that a conviction would have followed.

The judge spoke with memories of the testimony fresh in mind. He made no misstatement of fact and he correctly stated the relevant legal principles from *Strickland* and the mail fraud cases. We adopt his analysis.

We said recently that "[t]rial counsel's conduct was not deficient merely because he chose to pursue a different line of defense than appellate counsel would have pursued." *United States v. Chambers*, 918 F.2d 1455, 1461 (9th Cir.1990). Similarly, a defendant does not prove prejudice merely by arguing that the jury might have reached a different result if the case had been presented differently. *See Strickland*, 466 U.S. at 693–94, 104 S.Ct. at 2067–68.

Olson has not shown a reasonable probability of prejudice resulting from his attorney's allegedly deficient performance. He was not deprived of the effective assistance of counsel and his new trial motion was properly denied.

## II. Don Olson: Was The Indictment Improperly Amended?

Olson attacks the jury instructions because they included two words not found in the indictment. The indictment charged a scheme to defraud and "to obtain money." The jury was instructed that the elements of mail fraud included proof that the defendants schemed and intended "to obtain money *or property*" (emphasis added) by fraudulent means. Neither defendant objected to this instruction.[5]

Olson argues that the instruction improperly broadened the indictment and was reversible error. He asserts that the judge committed error by stating that for purposes of mail fraud, the customers' loss of the use of their money was a sufficient deprivation of a property right.[6]

Because Olson made no trial objection to the instruction he now contests, our review is limited to determining whether the instruction amounted to plain error.[7]

---

**5.** It is difficult to see how they could have objected. "Money, of course, is property." *United States v. Oren*, 893 F.2d 1057, 1062 (9th Cir. 1990). In using the words "money or property," the mail fraud statute describes a single unitary concept. *Cf. United States v. Young*, 730 F.2d 221, 224 (5th Cir.1984) (trial proof showing only "foreign commerce" did not constructively amend an indictment premised upon "interstate commerce" where the statute defining the offense used "interstate or foreign commerce" as a single unitary concept). Olson cites no mail fraud case that requires a nice distinction between money and property.

**6.** In denying Olson's motion for a new trial, Judge Dwyer said:
> [W]hether the diversion, the taking by fraudulent means of the victim's property or property right, is permanent or temporary is not decisive.
> The evidence, here again at a minimum, and again viewing it in a light favorable to the

defense, would have inevitably led I believe any jury to the finding that the defendant had the specific intent to at least temporarily defraud customers of their property by depriving them of the use of their funds by making fraudulent misrepresentations. That would be within the scope of the indictment, and also within the scope of the jury instructions, as well as the statute.

**7.** Olson argues that by so limiting our review we penalize him for the ineffective assistance of his trial counsel. We find no merit in this argument, having already rejected his ineffective assistance claim for failure to show prejudice. Without deciding the issue, we doubt Olson's premise that counsel's failure to object to instruction 14 was a performance deficiency. The failure to object to instruction 14, which was Ninth Circuit Model Jury Instruction No. 8.12B, might well have been considered an exercise of reasonable professional judgment. *See Strick-*

*See United States v. Bustillo,* 789 F.2d 1364, 1367 (9th Cir.1986). "Plain error is highly prejudicial error affecting substantial rights." *United States v. Kessi,* 868 F.2d 1097, 1102 (9th Cir.1989) (internal quotations and citations omitted). We may reverse for improper instructions only when necessary to prevent a miscarriage of justice or to preserve the integrity and fundamental fairness of the judicial process. *See United States v. Young,* 470 U.S. 1, 16–17 & n. 14, 105 S.Ct. 1038, 1046–47 & n. 14, 84 L.Ed.2d 1 (1984); *Bustillo,* 789 F.2d at 1367.

■ Under the grand jury clause of the fifth amendment, a defendant has a right to be tried only on the grand jury's indictment. *United States v. Miller,* 471 U.S. 130, 134, 105 S.Ct. 1811, 1814, 85 L.Ed.2d 99 (1985). This requirement serves the notice-related functions of protecting against unfair surprise, enabling the defendant to prepare for trial and permitting the defendant to plead the indictment as a bar to later prosecutions. *See id.* at 134–35, 105 S.Ct. at 1814–15. Requiring the proof to remain true to the indictment enables the grand jury to serve its function of protecting the citizenry. *Id.* at 139, 105 S.Ct. at 1816–17; *see Stirone v. United States,* 361 U.S. 212, 218 & n. 3, 80 S.Ct. 270, 273 & n. 3, 4 L.Ed.2d 252 (1960).

In *Stirone,* the Court indicated that sometimes a divergence of trial proof from the indictment will be an "insignificant variance" that constitutes harmless error. At other times, it will amount to an "amendment" that broadens the indictment. *See id.* at 215–17, 80 S.Ct. at 272–73. We distinguish variances from amendments by determining whether the charging terms of the indictment have been altered, either formally or in effect. *See United States v. Von Stoll,* 726 F.2d 584, 586 (9th Cir.1984) (an amendment exists where the trial in-

volves a distinctly different set of facts than was outlined in the indictment).

An amendment has a different impact than does a variance. An amendment always requires reversal, because it deprives a defendant of his right to be tried on the grand jury's charge. *Stirone,* 361 U.S. at 217, 80 S.Ct. at 273. A variance requires reversal only if it prejudices a defendant's substantial rights. *Von Stoll,* 726 F.2d at 587.

We find the difference between the indictment and the instruction here to be a variance, at most. The facts proved at Olson's trial corresponded to the facts charged. He was not convicted for transactions other than those charged. The government indicted him for executing a fraudulent scheme to obtain customers' money. It did not try to prove that he obtained anything but money.[8] *Cf. Stirone,* 361 U.S. at 213–14, 80 S.Ct. at 271–72 (improper amendment where indicted for interference with sand imports, but proof related only to steel exports).

*United States v. Von Stoll,* 726 F.2d 584 (9th Cir.1984), presented an analogous situation. The *Von Stoll* indictment charged the defendant with taking money from one partner, but the evidence at trial proved that he had taken money from another partner. *Id.* at 586. We found this a permissible variance, because the identity of the defrauded person was legally irrelevant. *Id.* at 587.

What matters on this mail fraud indictment is that Olson fraudulently obtained the use of others' money. Whether he intended that the effects of his fraud be permanent or temporary has no legal relevance.[9] The jury was correctly instructed that "[t]he government does not have to prove that the scheme or plan [to defraud] was successful or that any property or

---

*land v. Washington,* 466 U.S. 668, 690, 104 S.Ct. 2052, 2065–66, 80 L.Ed.2d 674 (1984) (performance prong requires considering whether counsel exercised "reasonable professional judgment").

**8.** The remarks by Judge Dwyer to which Olson attaches so much significance, *see supra* note 6, simply addressed Olson's defense that he had

always meant to return the money. This does not indicate that the *government* proved transactions at trial different from those described in the indictment.

**9.** The jury instructions did require finding that Olson had the specific intent to defraud.

money was obtained." *See United States v. Oren,* 893 F.2d 1057, 1061 (9th Cir.1990).

■ Any variance here did not prejudice the substantial rights of Don Olson. The case against him was very strong, and the indictment served its intended functions. The indictment gave fair notice of what the government would prove at trial. It gave victims, places and dates to protect him from double jeopardy. The indictment's citizen-protective function was also fulfilled. The government directed its trial proof to the transactions described. We find no plain error affecting Olson's substantial rights. He was convicted after a trial that remained true to his indictment, during which his right to counsel was respected. We affirm his convictions.

### III. Bryan Olson: Was There Sufficient Evidence to Convict Him?

■ Bryan Olson challenges the sufficiency of the evidence against him to establish his specific, fraudulent intent. He insists that the jury received no credible evidence showing that he knew of the condition of Rest–O–Pedic's finances or his father's diversion of funds. We assess the sufficiency of evidence for conviction by considering "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2789, 61 L.Ed.2d 560 (1979) (emphasis in original).

A conviction for aiding and abetting requires proof that the accused had the intent required for the underlying substantive offense. *United States v. Litteral,* 910 F.2d 547, 550 (9th Cir.1990). The substantive offense of mail fraud requires knowledge of the fraudulent purpose. *See*

*United States v. Price,* 623 F.2d 587, 591 (9th Cir.), *cert. denied,* 449 U.S. 1016, 101 S.Ct. 577, 66 L.Ed.2d 475 (1980), *overruled on other grounds, United States v. De Bright,* 730 F.2d 1255, 1259 (9th Cir.1984) (en banc).

Evidence showed that Bryan's function in the business was "customer relations," dealing with customers and their complaints and sending letters from Ted Wayne. The evidence revealed a pattern of Rest–O–Pedic customers receiving false delaying letters from "Ted Wayne" of "Customer Service." The postal inspector who investigated the business testified that Bryan admitted he had mailed Ted Wayne letters, but had lied to him about whether the letters were true.[10]

A former company employee testified that a conversation with Bryan Olson caused him to think that the second Ted Wayne letter was simply "a stall" meant to "buy[ ] time" because the Olsons were "[f]loating money." Another employee testified to a conversation she overheard at work in which Don and Bryan Olson were joking about redoing a letter regarding a defective bed part, to "satisfy ... the emotions" of a disgruntled customer and to keep the customer "quiet." A third former employee testified that he had witnessed Don Olson ask his son whether the latter "had sent the delay letter."

In denying Bryan Olson's motion for acquittal, the district court applied the *Jackson v. Virginia* standard and found that "[t]aken as a whole, the evidence was sufficient for a rational juror to infer that defendant knew of the scheme, took part in it, and intended that its objectives be achieved." Although the evidence of Olson's intent was circumstantial,[11] we agree that the record amply supports his convictions.

---

**10.** The postal inspector testified that Bryan claimed to "know through the factory" of the defects reported in the Ted Wayne letters. Bryan told the postal inspector that the letters were not sent "until Rest–O–Pedic had been informed of such a defect or unless in fact there was a problem with the bed." *Cf. United States v. Dial,* 757 F.2d 163, 170 (7th Cir.), *cert. denied,* 474 U.S. 838, 106 S.Ct. 116, 88 L.Ed.2d 95 (1985)

(mail fraud defendants' "elaborate efforts at concealment provide powerful evidence of their own consciousness of wrongdoing").

**11.** Judge Dwyer instructed the jury correctly on the difference between direct and circumstantial evidence, and that they were entitled to give the latter as much weight as the former.

## CONCLUSION

We affirm the convictions of both Olsons. Don Olson did not prove his ineffective assistance claim because he failed to show prejudice. He has failed to convince us that either the trial proof or the jury instructions differed from the indictment in any manner having legal or practical significance. We reject Bryan Olson's appeal because the evidence was sufficient for a rational jury to have found, beyond a reasonable doubt, that he harbored specific intent to defraud.

AFFIRMED.