67 F.3d 309
 NOTICE: Ninth Circuit Rule 36-3 provides that dispositions other than opinions or orders designated for publication are not precedential and should not be cited except when relevant under the doctrines of law of the case, res judicata, or collateral estoppel.
UNITED STATES of America, Plaintiff-Appellee,
v.
Rafat ASRAR and Tariq Ahmad, Defendants-Appellants.
 Nos. 93-50610, 93-50623.
 United States Court of Appeals, Ninth Circuit.
 Argued and Submitted Sept. 11, 1995.
Decided Oct. 3, 1995.
 
 1
 Before: BROWNING, PREGERSON, Circuit Judges, and TANNER,* District Judge.
 
 
 2
 MEMORANDUM**
 
 
 3
 Rafat Asrar appeals his conviction after a jury trial, and sentence under the Sentencing Guidelines for conspiracy (18 U.S.C. Sec. 371), arson (18 U.S.C. Sec. 844(i)), mail fraud (18 U.S.C. Sec. 1341, 2), and perjury (18 U.S.C. Sec. 1623). Tariq Ahmad appeals his jury conviction and sentence for the same offenses, along with proceeds of criminal activity (18 U.S.C. Sec. 1957), criminal forfeiture (18 U.S.C. Sec. 982), and transportation and export of hazardous waste and related offenses (42 U.S.C. Sec. 6928). We have jurisdiction under 28 U.S.C. Sec. 1291 and 18 U.S.C. Sec. 3742(a). We affirm in part and reverse in part.
 
 
 4
 I. JURY INSTRUCTIONS ON AHMAD'S HAZARDOUS WASTE COUNTS
 
 
 5
 Ahmad contends that the jury instructions on the hazardous waste counts were erroneous because they misstated the statutory definition of hazardous waste. We review de novo whether a jury instruction misstates the elements of a statutory crime. United States v. Blinder, 10 F.3d 1468, 1477 (9th Cir.1993).
 
 
 6
 Ahmad was convicted of four counts of illegally transporting and exporting hazardous waste in violation of the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. Sec. 6901 et seq. Under the RCRA, the definition of "hazardous waste" includes "solid waste" that may pose a substantial hazard when improperly disposed of. 42 U.S.C. Sec. 6903(5)(b). The regulations promulgated under the RCRA define solid waste as "discarded material" that is "abandoned." 40 C.F.R. Sec. 261.2(a)(2)(i). The regulations state further that material is "abandoned" if it is "being disposed of" or if it is "being ... stored ... before or in lieu of ... being disposed of." 40 C.F.R. Secs. 261.2(b)(1) and (3).
 
 
 7
 Jury instruction number fifty defined "hazardous waste" as including "abandoned material." "Abandoned material" was then defined as "any material which is disposed of or intended to be disposed of...." Attachment to Ahmad's Supplemental Brief.
 
 
 8
 Ahmad contends that hazardous material only becomes "waste" if it is actually disposed of. Ahmad asserts that what he intended to do with this material is irrelevant.
 
 
 9
 Under Ahmad's definition, the material that he shipped to Pakistan, although hazardous, would only be transformed into "hazardous waste" if he physically disposed of it. Ahmad therefore claims that jury instruction number fifty, which defined hazardous waste as including hazardous material "intended to be disposed of," was erroneous.
 
 
 10
 Counter to what Asrar argues, the intent of a person possessing hazardous material certainly is relevant to whether that material is waste under the RCRA. Neither the statute nor the regulations require that the material actually be disposed of before it becomes "hazardous waste." The trier of fact must determine whether the possessor of the hazardous material is in the process of disposing of the material or is storing the material in preparation for or in lieu of disposing of it. The intended use of the material thus may determine whether it is waste. See American Mining Congress v. United States EPA, 824 F.2d 1177, 1186 (D.C.Cir.1987) (a material that is "destined for beneficial reuse or recycling in a continuous process by the generating industry itself" is not discarded and thus is not waste.)
 
 
 11
 In sum, if Ahmad intended to dispose of the material then it was either "being disposed of" or "being stored before or in lieu of being disposed of." The chemicals thus met the statutory and regulatory definition of hazardous waste. The jury instructions were correct in defining hazardous waste as "any material which is disposed of or intended to be disposed of...."
 
 
 12
 II. SUFFICIENCY OF THE EVIDENCE TO SUPPORT AHMAD'S CONVICTIONS FOR ILLEGALLY TRANSPORTING AND EXPORTING HAZARDOUS WASTE
 
 
 13
 Asrar argues that there was insufficient evidence to support his convictions for the transport and export of hazardous waste because he intended to use, not discard, the hazardous material.
 
 
 14
 We will uphold a conviction if, viewing the evidence in the light most favorable to the government, any rational trier of fact could have found the essential elements of the crime charged beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979) (emphasis in original).
 
 
 15
 As discussed above, under the RCRA and regulations "hazardous waste" includes hazardous material that is being disposed of or is being stored before or in lieu of being disposed of.
 
 
 16
 There was ample evidence presented in this case from which a reasonable juror could conclude that Ahmad intended to dispose of, not re-use, the chemicals. For example, Ahmad made an insurance claim for costs of disposing of the chemicals, including shipment to Pakistan. Govt.ER at 1946-48. There was testimony that Ahmad had stated that he intended to dump the chemicals down mine shafts owned by his family in Pakistan. Govt.ER at 1542. In fact, the chemicals were shipped to Pakistan, Govt.ER at 1525, but the Pakistani government refused to allow them into the country. Govt.ER at 1557-58, 1561-62. Evidence was also presented that, at the time Ahmad shipped the chemicals to Pakistan, his alleged chemical lab in Karachi consisted of only a shell of a building with a sign posted outside. Govt.ER at 1389-94, 1567-68.
 
 
 17
 Although Ahmad presented evidence that he intended to re-use the chemicals at his laboratory in Pakistan, the jury evidently did not believe this claim,[1] and instead chose to believe the government's theory, which was clearly supported by the evidence. There was sufficient evidence to support Ahmad's convictions for illegally transporting and exporting hazardous waste in violation of 42 U.S.C. Sec. 6928.
 
 
 18
 III. SUFFICIENCY OF THE EVIDENCE TO SUPPORT AHMAD'S CONVICTION FOR KNOWINGLY TRANSPORTING HAZARDOUS WASTE TO AN UNPERMITTED LOCATION
 
 
 19
 Ahmad was charged with and convicted of knowingly transporting hazardous waste from the premises of his laboratory, Shankman Laboratories, to Castelazo & Associates ("Castelazo"), a facility that does not have a permit, in violation of 42 U.S.C. Sec. 6928(d)(1). Ahmad argues that the evidence presented was insufficient to prove Ahmad's knowledge that Castelazo, a freight forwarding company, did not have permit.
 
 
 20
 Ahmad was familiar with the chemical business. He had used a hazardous waste manifest in the past for transport of waste to permitted facilities. Govt.ER at 1512-15. Ahmad did not provide the required manifest to the driver who picked up the chemicals and transported them to Castelazo. Govt.ER at 1145-46. In fact, Ahmad did not tell the driver who picked up the chemicals that they were hazardous and did not provide the driver with any documentation of what the shipment contained. Govt.ER at 1145-46, 1193.
 
 
 21
 The shipment was packed hurriedly in flimsy containers that were unsafe for transporting hazardous materials. Govt.ER at 1141, 1191-92. Moreover, there was testimony that Ahmad grossly misrepresented to Castelazo the amount and type of hazardous material that he wanted them to arrange to have shipped to Pakistan. Govt.ER at 1138-41.
 
 
 22
 Based on this evidence, a rational juror could conclude that Ahmad knew that Castelazo did not have the required RCRA permit. There was sufficient evidence to support Ahmad's conviction of violating 42 U.S.C. Sec. 6928(d)(1).
 
 
 23
 IV. LIMITATION ON AHMAD'S CROSS-EXAMINATION OF JAVAID KHAN
 
 
 24
 Ahmad argues that the district court restricted defense counsel's cross-examination of witness Javaid Khan in violation of the confrontation clause.
 
 
 25
 We review a district court's decision to limit cross-examination of a witness for abuse of discretion. United States v. Dischner, 974 F.2d 1502, 1514 n. 12 (9th Cir.1992), cert. denied, 113 S.Ct. 1290 (1993). Whether limitations on cross-examination are so severe as to constitute a violation of the confrontation clause is a legal question subject to de novo review. United States v. Vargas, 933 F.2d 701, 704 (9th Cir.1991). Because a district court has great discretion in limiting cross-examination, "a reviewing court normally will hold that the district court violated the confrontation clause only if it concludes that the district court denied the jury 'sufficient information to appraise the biases and motivations of the witness.' " United States v. Jenkins, 884 F.2d 433, 436 (9th Cir.), cert. denied, 493 U.S. 1005 (1989) (quoting United States v. McClintock, 748 F.2d 1278, 1289 (9th Cir.1984), cert. denied, 474 U.S. 822 (1985)).
 
 
 26
 Ahmad argues that the district court impermissibly restricted his ability to cross-examine Javaid Khan on the details of a meeting at Shankman Labs where Ahmad showed Khan how to start a fire. Khan testified on direct examination as follows.
 
 
 27
 On November 16, 1989, Ahmad pulled aside Khan and Ahmad's brother, Mobashir, at the laboratory. Ahmad filled a beaker with a solvent and heated the solvent on a hot plate for about one minute. Khan did not know what solvent was used during the demonstration. When the solvent began to bubble and the solvent caught fire inside the beaker, Ahmad knocked the beaker to the floor, and flames erupted on the floor. Ahmad stamped the fire out with his feet. Ahmad then stated that "all you need to do is to start a small fire" and the fire company "will take care of the rest." Govt.ER at 368.
 
 
 28
 Counsel for Ahmad and Asrar then cross-examined Khan for two days. Asrar's counsel questioned Khan intensely about his observations of the solvent and its reaction to the heat. Asrar's counsel attempted to impeach Khan's credibility by trying to get Khan to admit that a solvent heated in an uncovered beaker would not catch fire without a spark. But Khan would not budge from his testimony. See Govt.ER at 572-585. The district court finally directed Asrar's counsel to move onto another line of inquiry, noting that despite extensive questioning, counsel had not been able to get Khan to make the impeaching statement. Govt.ER at 586.
 
 
 29
 Counsel for Asrar and Ahmad had extensive opportunity to cross-examine Khan, and the district court's termination of this line of questioning was not an abuse of discretion. Moreover, after two days of cross-examination the jury had sufficient information from which to evaluate Khan's possible biases and motivations, and so this slight limitation on Khan's cross-examination was not a violation of the confrontation clause. The court gave Asrar's attorney sufficient time to attempt to impeach Khan's credibility on this point. Furthermore, as the court noted in making its ruling, defense counsel were able to present ample evidence on their theory that Khan's description of the fire was a physical impossibility through cross-examination of Alvin Jacobsen, Los Angeles County Fire Department fire captain. Govt.ER at 684-86.
 
 
 30
 In sum, there was no confrontation clause violation.
 
 
 31
 V. SUFFICIENCY OF THE EVIDENCE TO SUPPORT AHMAD'S ARSON CONVICTION
 
 
 32
 Ahmad next argues that the evidence was insufficient to support his arson conviction because it was based upon evidence that was incredible as a matter of law.
 
 
 33
 Ahmad contends that the scientific testimony provided by Dr. Robert Armstrong, a forensic electrical engineer, concerning the origin of the fire, was contrary to the laws of physics. Ahmad also asserts that Javaid Khan's testimony that the heated solvent broke into flame was physically impossible.
 
 
 34
 First, Ahmad argues that no credible evidence was put forward to refute his contention that the November 30, 1989 fire was accidental. Ahmad told fire investigators that he was moving a chemical, cyclohexane, across the laboratory with a hand truck. Ahmad said that the hand truck became entangled with the cord from a hot plate, the cyclohexane container spilled, and he jumped back, unplugging the electrical cord. According to Ahmad, a spark and flash ensued, and the fire followed.
 
 
 35
 The government's expert, Dr. Armstrong, testified at trial that he examined the hot plate, the adaptor, and the electrical cords under a microscope and saw no electrical arcing damage on the male blades of the hot plate's cord nor on the female end of the adaptor. This testimony refuted Asrar's story, because if the electrical cord had been the cause of the spark, then there would have been arcing damage present on the cord. Govt.ER at 697. Dr. Armstrong also testified that cyclohexane acts as an insulator, and thus if the chemical had spilled on the electrical cord, it would not have caused a spark. Govt.ER at 726.
 
 
 36
 Ahmad argues that this testimony was contrary to the laws of physics because the defendants' expert, Dr. Allen, testified that under certain circumstances, electrical arcing might possibly occur without leaving a mark. Dr. Armstrong disagreed with that assertion. The jury evidently chose to follow the conclusions of the government's expert. The fact that the defense put forward evidence that conflicted with the testimony of the government's expert does not render Dr. Armstrong's testimony incredible as a matter of law.
 
 
 37
 Ahmad also asserts that Javaid Khan's testimony about Ahmad's demonstration on how to start a fire was contrary to the law of physics. Asrar's counsel tried to get Khan to admit on cross-examination that a solvent would not self-ignite in an uncovered container, and therefore it was impossible that Khan saw flames inside the beaker. Khan, who holds graduate degrees in chemistry, would not commit to that proposition.
 
 
 38
 But Captain Jacobsen of the Los Angeles Fire Department testified that in the situation observed by Khan, the heated glass beaker itself or the hot plate could serve as the ignition source for the fire. Jacobsen explained that vapors escaping from the heated solvent could ignite if they made contact with the hot plate or the heated glass of the beaker. This testimony provided corroboration for Khan's observations. Therefore, Khan's testimony about the November 16, 1989 fire demonstration was not incredible as a matter of law.
 
 
 39
 Moreover, the government presented evidence which clearly established Ahmad's motive, preparation, and execution of his arson scheme. Evidence was presented that Shankman Labs was in serious financial trouble and unable to pay its creditors. Govt.ER at 408-409, 979-980. Ahmad had, however, found enough money to triple Shankman Labs' insurance coverage only four months before the fire. Govt.ER at 1002-10. This insurance lapsed because the premiums were not paid but Ahmad sent a $2200 check to reinstate the insurance only two weeks before the fire. GovtER at 426-431. Khan also testified that Ahmad called Khan in New York and claimed to have successfully set a fire in the lab. GovtER at 381. Thus, there was more than sufficient evidence from which a rational juror could find Ahmad guilty of committing arson in violation of 18 U.S.C. Sec. 844(i).
 
 
 40
 VI. SUFFICIENCY OF THE EVIDENCE TO SUPPORT AHMAD'S PERJURY CONVICTION
 
 
 41
 Ahmad next argues that the evidence was insufficient to support his conviction for knowingly submitting a false declaration under penalty of perjury to the grand jury.
 
 
 42
 Ahmad was served a subpoena to testify before a grand jury. Ahmad Excerpt of Record ("Ahmad ER") at 49-53. The attachment to the subpoena requested that Ahmad produce, inter alia, "all documents and records" related to Pacific Energy and Mining Company, Industrial Waste Processing, Shankman Labs, Brown Laboratory, MRJ Importers, Pakistan Chrome Mines, and Pacific Chemicals. The attachment listed out four pages of specific examples of the records requested.
 
 
 43
 Ahmad submitted a declaration to the grand jury in lieu of testifying, and after consulting with counsel. Ahmad's declaration stated that he provided to the grand jury all documents and records in his possession, custody and control that were required by the subpoena. Govt.ER at 1461. After Ahmad submitted this declaration, Ahmad's home was searched and the substantial amounts of incriminating documents that had been specifically requested by the subpoena were discovered.
 
 
 44
 Ahmad argues that his declaration was truthful and accurate because he reasonably interpreted the subpoena as not requiring production of his "personal files." But there was sufficient evidence from which a reasonable juror could conclude that Ahmad, the owner of several businesses, understood what was required by the subpoena. There was no language in the subpoena making any distinction between files kept in the home versus those stored at his business, nor between "personal" versus business files. Furthermore, much of the material recovered from the search of Ahmad's home was expressly requested by the subpoena (e.g., Pacific Energy and Mining Corporation stock transfers related to Shankman Labs and Industrial Waste Processing).
 
 
 45
 There was more than sufficient evidence to support Ahmad's conviction for violating 18 U.S.C. Sec. 1623 by submitting a perjurious declaration to the grand jury.
 
 
 46
 VII. ADMISSION OF PHOTOGRAPHIC EVIDENCE REGARDING THE CONDITION OF THE CHEMICALS EXPORTED TO PAKISTAN
 
 
 47
 The district court's evidentiary rulings are reviewed for an abuse of discretion. United States v. Blaylock, 20 F.3d 1458, 1462 (9th Cir.1994). "A nonconstitutional evidentiary error will be reversed for an abuse of discretion only if the court's ruling more likely than not affected the verdict." United States v. Chu Kong Yin, 935 F.2d 990, 994 (9th Cir.1991).
 
 
 48
 Ahmad sought to have admitted into evidence photographs of the chemicals he had attempted to ship to Pakistan. Ahmad's purpose in having the photographs admitted was to prove that the chemicals were in usable condition, and thus that he was not discarding them when he sent them to Pakistan. The photographs were taken nine months after the chemicals were returned to the United States (because the Pakistani government refused to accept them). At the time the photographs were taken, the chemicals were in the possession of a business called Eticam.
 
 
 49
 The district court ruled that the photographs were irrelevant to the issue of whether Ahmad intended to discard the chemicals at the time that he shipped them. The district court was correct in its ruling. Under the RCRA, the intent to discard a usable material renders it hazardous waste. See 40 C.F.R. 261.2(b)(1). The fact that some other business nine months later may have found a use for the chemicals is not relevant to whether Ahmad intended to dispose of the material at the time that he shipped it.
 
 
 50
 Moreover, even if the evidence were marginally relevant to Ahmad's intended use of the chemicals, any error in refusing to admit the photographs into evidence was harmless. There was extensive evidence which indicated that Ahmad intended to dispose of the chemicals when he shipped them to Pakistan. Ahmad described his chemical inventory as a "total loss" for insurance purposes, and he received an insurance payment to cover disposal costs of the chemicals. Ahmad also admitted to several witnesses that he intended to have the chemicals dumped into a mining shaft in Pakistan. Govt.ER at 1042, 1239. Therefore, Ahmad's claim that the district court committed reversible error in refusing to admit the photographs into evidence lacks merit.
 
 VIII. INEFFECTIVE ASSISTANCE OF COUNSEL
 
 51
 Asrar argues that he was denied effective assistance of counsel when his attorney failed to move under Rule 8(b) of the Federal Rules of Criminal Procedure to sever the RCRA counts and the money laundering counts brought only against Ahmad from the charges brought jointly against Asrar and Ahmad.
 
 
 52
 We review de novo a claim of ineffective assistance of counsel. United States v. Swanson, 943 F.2d 1070, 1072 (9th Cir.1991). The customary procedure for challenging the effectiveness of counsel at a federal criminal trial is a collateral attack on the conviction. Id. at 1072. The rationale for this rule is that such a claim cannot usually be advanced without the development of facts outside the original record. United States v. Houtchens, 926 F.2d 824, 828 (9th Cir.1991).
 
 
 53
 Here, Asrar claims that his counsel was ineffective because he failed to move for a severance of the charges brought solely against Ahmad. This case does not fall within that narrow group of ineffective assistance claims that can be evaluated without the development of facts outside of the record. To be successful in his claim, Asrar must show that his counsel's decision in not moving to sever the RCRA and money laundering claims was a strategic one. Such proof requires the development of facts outside of the trial record. The appropriate forum for hearing this claim is on a 28 U.S.C. Sec. 2255 petition. We therefore decline to rule on this claim.
 
 
 54
 IX. CONSTRUCTIVE AMENDMENT OF THE MAIL FRAUD COUNTS
 
 
 55
 Asrar argues that the government constructively amended the mail fraud counts (Counts Three through Nine of the information) by broadening its theory of liability to include overbilling as a basis for mail fraud, instead of limiting its theory of mail fraud to that charged in the information, i.e., that Ahmad and Asrar defrauded the insurance company by claiming the fire was accidental.
 
 
 56
 Asrar did not object to the government's alleged constructive amendment of the mail fraud counts at trial, and therefore we review this claim for plain error. United States v. Dischner, 974 F.2d 1502, 1515 (9th Cir.1992), cert. denied, 113 S.Ct. 1290 (1993). "A plain error is a highly prejudicial error affecting substantial rights." United States v. Ortiz-Lopez, 24 F.3d 53, 55 (9th Cir.1994).
 
 
 57
 Under the Fifth Amendment, a defendant has a right to be tried only on the grand jury's indictment. United States v. Olson, 925 F.2d 1170, 1175 (9th Cir.1991). This right serves the "notice-related functions of protecting against unfair surprise, enabling the defendant to prepare for trial and permitting the defendant to plead the indictment as a bar to later prosecutions." Id.
 
 
 58
 In United States v. Stirone, 361 U.S. 212, 215-17 (1960), the Supreme Court distinguished amendments of the indictment from cases where the divergence of trial proof from the indictment is an "insignificant variance." A divergence between proof at trial and the indictment constitutes a constructive amendment only when it alters the crime charged. United States v. Von Stoll, 726 F.2d 584, 586 (9th Cir.1984). An amendment from the indictment is per se reversible error, whereas a variance requires reversal only if it prejudices a defendant's substantial rights. Olson, 925 F.2d at 1175.
 
 
 59
 In the present case, Asrar's claim amounts at most to a variance. The mail fraud counts charged in the information gave Asrar fair notice that the government's theory of the fraudulent scheme would not be limited to the defendants' telling the insurance company that the fire was accidental, but would also include evidence that the defendants submitted false and inflated damages claims. For example, the outline of the fraudulent scheme in the information states:
 
 
 60
 From on or about December 19, 1989, through on or about April 16, 1990, defendant Tariq Ahmad, acting through his agent, the Greenspan Company, fraudulently caused Fireman's Fund Insurance Company to pay approximately $205,306.96 on defendant Tariq Ahmad's insurance claim based on the damage caused by the fire at Shankman Laboratories.
 
 
 61
 Ahmad ER at 37.
 
 
 62
 Any variance from the information caused by the government submitting evidence on overbilling to support the charges of mail fraud did not prejudice Asrar's substantial rights. Therefore we reject this claim. There was no constructive amendment of the mail fraud count. We affirm Asrar's conviction of violating 18 U.S.C. Sec. 1341.
 
 
 63
 X. PROSECUTORIAL MISCONDUCT DURING CLOSING ARGUMENT
 
 
 64
 Asrar next argues that the government committed prosecutorial misconduct when it argued twelve different bases for convicting Asrar of perjury when the information alleged only two false statements.
 
 
 65
 Asrar did not raise this objection at trial, therefore we review his claim for plain error. United States v. Laurins, 857 F.2d 529, 539 (9th Cir.1988), cert. denied, 492 U.S. 906 (1989). Reversal on this claim is appropriate, therefore, only "if necessary to prevent a miscarriage of justice or to preserve the integrity of the judicial process." Id.
 
 
 66
 Count Eighteen of the information charged Asrar with committing perjury by giving two false statements to the grand jury. First, Asrar stated that he did not help Ahmad burn down Shankman Labs. Second, Asrar told the grand jury that he did not attend a meeting where Ahmad discussed burning down Shankman Labs.
 
 
 67
 Asrar contends that the government committed prosecutorial misconduct during closing argument by discussing ten different lies allegedly committed by Asrar, instead of limiting its argument to the two lies set forth in Count Eighteen. See Asrar Excerpt of Record ("Asrar ER") at 94-97. However, the prosecutor mentioned the other falsehoods and inconsistent statements to prove that Asrar knew he was lying when he made the two statements that formed the basis of Count Eighteen.[2] The prosecutor did not suggest that any of the other false statements that he mentioned were part of the perjury charge against Asrar. Moreover, the district court specifically instructed the jury on the elements of the perjury charge, and told the jury that it must find that Asrar falsely uttered one or the other statement listed in Count Eighteen.
 
 
 68
 Therefore, the prosecution did not commit misconduct when it discussed other alleged lies made by Asrar in conjunction with its argument on the perjury charge against Asrar.
 
 
 69
 XI. FAILURE TO SUBMIT A JURY INSTRUCTION ON THE MATERIALITY ELEMENT OF PERJURY
 
 
 70
 Asrar and Ahmad contend that the district court erred by failing to instruct the jury on the materiality element of perjury.[3] Both Asrar and Ahmad were convicted of perjuring themselves before a grand jury in violation of 18 U.S.C. Sec. 1623(a). Asrar testified before the grand jury; Ahmad submitted a written declaration.
 
 
 71
 The two false statements for which Asrar was convicted of perjury were (1) denying that he attended a meeting at which the arson of Shankman Labs was discussed and (2) denying that he helped commit the arson of Shankman Labs. Ahmad ER at 45. Ahmad's false declaration represented that he had provided the grand jury with all documents in his possession covered by a government subpoena. Govt.ER at 879-891, 895-905.
 
 
 72
 The materiality of a false statement is one of the essential elements of a perjury conviction. United States v. Rubio-Topete, 999 F.2d 1334, 1341 n. 2 (9th Cir.1993) (citing United States v. Dunnigan, 113 S.Ct. 1111, 1116 (1993). Making false declarations before a grand jury, a type of perjury, also requires that the false statements be material. United States v. Gordon, 844 F.2d 1397, 1404 (9th Cir.1988). A false statement is material "[i]f the falsity of the testimony would have the natural tendency to influence the grand jury's investigation...." Gordon, 844 F.2d at 1404 (quoting United States v. Kelly, 540 F.2d 990, 993 (9th Cir.1976) cert. denied 429 U.S. 1040 (1977)).
 
 
 73
 Previously, we held that the materiality of perjured testimony was an issue of law for the court to decide rather than the jury. United States v. Clark, 918 F.2d 843, 845 (9th Cir.1990) (citing Sinclair v. United States, 279 U.S. 263, 298 (1929), overruled by United States v. Gaudin, 115 S.Ct. 2310 (1995)). Subsequent to Asrar's and Ahmad's convictions, we reconsidered this question and suggested that the materiality of a perjured statement should be decided by the trier of fact. United States v. Gaudin, 28 F.3d 943, 949 (9th Cir.1994) (en banc), aff'd, 115 S.Ct. 2310 (1995). The Supreme Court agreed, finding that "the proposition that the element of materiality in perjury prosecutions is to be decided by the judge ... is contrary to the uniform general understanding ... that the Fifth and Sixth Amendments require conviction by a jury of all elements of the crime [and] we must reject those cases that have embraced it." Gaudin, 115 S.Ct. 2310, 2317-18 (1995).
 
 
 74
 The issue of whether Asrar's statements and Ahmad's declaration were material should thus have been submitted to the jury. Error occurred when the jury was not instructed on this issue. This error was per se harmful because the jury was precluded from considering whether one of the essential elements of perjury was properly proved. Gaudin, 28 F.3d at 951.
 
 
 75
 Although neither Asrar's nor Ahmad's attorney requested a jury instruction on the materiality of the false statements at issue, the court may review an issue raised for the first time on appeal "when the issue arises by virtue of a change in law while the appeal is pending." Mkhsian, 5 F.3d at 1310 (citation omitted). Moreover, " 'a new rule for the conduct of criminal prosecutions is to be applied retroactively to all cases ... pending on direct review or not yet final, with no exception for cases in which the new rule constitutes a 'clear break' with the past.' " Id. at 1310-1311 (quoting Griffith v. Kentucky, 479 U.S. 314, 328 (1987)). A party need not have objected to the ruling to preserve an issue for appeal if to do so "would have been futile because 'a solid wall of circuit authority' " would have prevented the judge from granting the objection. Guam v. Yang, 850 F.2d 507, 512 n. 8 (9th Cir.1988) (en banc) (quoting United States v. Scott, 425 F.2d 55, 57-58 (9th Cir.1970)). In these circumstances, review is appropriate even though defense counsel did not object to the jury instructions at trial, and "we review the instruction for reversible error, rather than plain error." Id.
 
 
 76
 Clearly, failure to submit the element of materiality to the jury was error under Gaudin. We therefore reverse Asrar's conviction on count 18 and Ahmad's conviction on count 19 and remand for further proceedings consistent with this opinion.
 
 
 77
 XII. ENHANCEMENT UNDER U.S.S.G. Sec. 2K1.4 FOR KNOWINGLY CREATING A SUBSTANTIAL RISK OF DEATH OR SERIOUS BODILY INJURY
 
 
 78
 Ahmad and Asrar both argue that the district court erred in enhancing their sentences under section 2K1.4 of the Sentencing Guidelines.
 
 
 79
 Whether a defendant knowingly created a substantial risk of death or serious bodily injury within the meaning of section 2K1.4 of the Guidelines is a factual question reviewed for clear error. United States v. Karlic, 997 F.2d 564, 568-569 (9th Cir.1993).
 
 
 80
 The determination whether a section 2K1.4 enhancement is appropriate is a two-step inquiry. First, a court must ask objectively whether defendants' actions created a substantial risk of death or serious bodily injury; and second, the court must decide subjectively whether defendants acted knowingly in creating that risk. Id. at 569.
 
 
 81
 The district court did not clearly err in applying this enhancement to both defendants. First, the fire objectively created a substantial risk of death or serious bodily injury. It was started in a chemical laboratory which housed hundreds of bottles of hazardous chemicals. Moreover, the fire was started at about four p.m. on a workday, and there were forty-five people at work in other businesses in that building at the time.
 
 
 82
 As to the second inquiry, under Karlic, the sentencing court is required to determine whether the defendants were subjectively aware of the practical certainty of substantial risk of death or serious bodily injury. Again, we conclude that the district court did not clearly err in its determination. The evidence is abundant that Asrar purposely set the fire at the behest of Ahmad. Both defendants clearly knew about the flammability of the solvents in the laboratory, because Ahmad demonstrated to Asrar how to set a fire only weeks before the arson occurred. The evidence thus supports the district court's determination that the defendants subjectively knew that their fire would cause a substantial risk of injury or death.
 
 
 83
 The district court did not clearly err in applying this enhancement to both Asrar and Ahmad.
 
 
 84
 Affirmed in part, reversed in part, and remanded for further proceedings.
 
 
 
 *
 The Honorable Jack E. Tanner, Senior United States District Judge for the Western District of Washington, sitting by designation
 
 
 **
 This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by 9th Cir.R. 36-3
 
 
 [1]
 Ahmad's own witness admitted on cross-examination that Ahmad did not have an operating chemical lab in Pakistan. Government's Excerpt of Record ("Govt.ER") at 1355-1358
 
 
 [2]
 For example, the prosecutor argued that Asrar's statement to the grand jury that he was moving documents when the fire occurred, and not cyclohexane as he had earlier told fire investigators, was proof that Asrar was indeed lying about his involvement in setting the fire
 
 
 [3]
 Asrar raised this issue in his opening brief; Ahmad did not. We ordered supplemental briefing on this issue in light of the Supreme Court's intervening decision in United States v. Gaudin, 115 S.Ct. 2310 (1995). In our Order, we referred to Count 18 of the Indictment which related to Asrar's perjury before the grand jury. Ahmad moved to join Asrar's briefs and to submit a supplemental brief addressing the materiality issue as it related to his perjury conviction on Count 19 of the Indictment. We granted Ahmad's motion to file a supplemental brief
 The Federal Rules of Appellate Procedure provide that "[i]n cases involving more than one appellant or appellee, including cases consolidated for purposes of the appeal, any number of either may join in a single brief, and any appellant or appellee may adopt by reference any part of the brief of another. Parties may similarly join in reply briefs." Fed.R.App.P. 28(i). Although Ahmad did not attempt to join in Asrar's briefs until he filed a motion to submit a supplemental brief, under Federal Rule of Appellate Procedure 2, we have discretion to suspend the rules. We have previously allowed a defendant to adopt in a reply brief an argument raised by a co-defendant in his opening brief. United States v. Mkhsian, 5 F.3d 1306 (9th Cir.1993). We thus granted Ahmad's second motion and allowed him to join in Asrar's briefs.
 Allowing Ahmad to join in Asrar's briefs will not prejudice the government as it had the opportunity to fully address this issue in its original and supplemental briefs as the issue pertained to Asrar. See id. at 1310.